TOTAL SAFETY SERVICES, INC.
218 MAGNOLIA STREET
LONG BEACH, MISSISSIPPI 39560

ACCIDENT INVESTIGATION – SAFETY CONSULTING - LITIGATION SUPPORT

# PEDERO SANDERS
# VERSUS
# WEEKS MARINE, INC.

**DATE**
**July 21, 2022**

**CIVIL ACTION: 23-7317**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**
**JUDGE: BARRY W. ASHE**

**Prepared for**

**MR. ANTHONY BUZBEE & MR. CHRIS LEAVITT**
**THE BUZBEE LAW FIRM**
**600 TRAVIS, SUITE 7300**
**HOUSTON, TEXAS 77002**

**EXHIBIT**
**A**

TELEPHONE NO.:(504) 415-0945
111TOTAL@GMAIL.COM

# INTRODUCTION

This **preliminary** ROOT CAUSE ANALYSIS report investigates the accident that occurred aboard a tow of the ***JS CHATRY DREDGE***, a Cutter Head Dredge, owned by Weeks Marine, Inc., on or about November 8, 2022, at or about 2:30 PM, and outlines the findings from that investigation.

# QUALIFICATIONS

***Please see my Curriculum Vitae for a further explanation of my qualifications as a Safety Professional.***

A safety professional in any given industry must have a working knowledge of the various operations his company performs in that industry and the applicable governing regulations. I bring to the table over 50 years of safety experience in the industries relating to the exploration, production, and transport of oil and gas and the marine, general, and commercial industries. My expertise in safety issues on production platforms, barges, structural, fabrication yards, vessels/boats, commercial and industrial buildings, and building projects is extensive.

This on-the-job work experience began in the mid-sixties while working offshore in the Gulf of Mexico on production platforms and drilling rigs, performing the duties of a Roustabout, Rigger, Welder's Helper, and Wireline Operator. I also worked on the Mississippi River and in Fabrication yards and Shipyards as a Roustabout, Rigger, Welder's Helper, and Equipment Operator. Further safety experience and expertise were derived from being the manager/supervisor of the Safety Department for Amerada Hess Corp. (Lafayette region); J. Ray McDermott, Inc. (Marine and Diving Divisions, Harvey Group), McDermott International, Inc. (Singapore, South East Asia Group) and the president or owner of Contract Safety Consultants, Preferred Employees, and Total Safety Services, Inc. Companies I worked for include New Orleans Stevedores, Houma Welders, Smith Wallander, Boland Machine, and Manufacturing. My safety consulting experience was gained by providing safety consultant services to the following: Gulf South Laboratories, Engineering Inspection and Investigation, Inc., Inspection Consultants, Inc., Ray Gibbins Industries, Allied Wireline, Western Wireline, Popich Brothers, Space, L&L Construction, Kaough & Jones, Kranco, Garza Welding, T & A Wireline, TCB Industries, Rembco, Foley Construction, Delta Coatings, Delta Temp, Inc., Cortex, Southern Environmental Control, Eagle Marine, American Marine, Mosby Enterprises, Total Marine Services, Vela Garage, Doomlar, Energy Drilling, Grady Crawford, Guilliot Construction, J & J Electric, Taylormade Enterprises, U. S. Abatement, Vogt Construction, Wescorp Construction, and Blake Drilling,

The companies I was employed by or contracted with followed the Federal regulations listed below and voluntarily followed the Industry Standards of Care as listed. As their safety officer, I was required to have a working knowledge of those regulations and standards of care and the ability to apply them to the company's oil and gas exploration and productions and marine, general, industrial, and commercial work activities.

**Subcategories for each section are listed in more detail in my *Curriculum Vitae.***

**Working knowledge of Federal Regulations 29:**
1910 General Industry, 1926 Construction, 1915 Shipyard, 1918 Longshoring, 1919 Gear Certification

**Working knowledge of Federal Regulations 46:**
Subchapter C - Uninspected Vessels
Subchapter D – Tank Vessels
Subchapter H – Passenger vessels
Subchapter I - Cargo and Miscellaneous Vessels
Subchapter I-A - Mobile Offshore Drilling Units
Subchapter K – Small Passenger Vessels carrying more than 150 passengers
Subchapter L – Offshore Supply Vessels
Subchapter M – Towing Vessels
Subchapter T – Small Passenger Vessels

**Working knowledge of Federal Regulations 30:**
Chapter II – Bureau of Safety and Environmental Enforcement, Department of the Interior
Subchapter B - Offshore

**Working knowledge of Federal Regulations 33:**
Subchapter B – Offshore
Subchapter N - Outer Continental Shelf Activities

**Working knowledge of the following industry standards:**
(API) American Petroleum Institute
(ANSI) American National Standards Institute
(ASME) American Society of Mechanical Engineers
(AWS) American Welding Society
(CGA) Compressed Gas Associations, Inc.
(ASTM) American Society for Testing and Materials
(ABS) American Bureau of Shipping
(NFPA) National Fire Protection Association
(NIOSH) National Institute for Occupational Safety and Health
(SAE) Society of Automotive Engineers
(UL) Underwriters Laboratories
(NEC) National Electrical Code
(AWO) American Waterways Operators
(ISM) International Safety Management
(SSPC) Steel Structures Painting Council.

# METHODOLOGY – ROOT CAUSE ANALYSIS

Root Cause Analysis (RCA) is a powerful method for identifying the underlying causes of accidents or incidents. It goes beyond the immediate and apparent triggers to uncover the systemic issues that allow these incidents to occur. By dissecting an accident into its contributing factors and examining the chain of events that led to it, RCA provides a comprehensive framework for understanding how and why something went wrong. This approach is crucial for implementing effective preventive measures to avoid future accidents.

Using RCA, specifically through the Events and Causal Factor Analysis, to investigate accidents showcases a systematic approach to safety. By breaking down the accident into a structured step-by-step analysis, you can pinpoint specific areas of concern contributing to the accident's occurrence. This thoroughness is key to creating safer work environments, especially in industries with a high potential for accidents due to complex operations and hazardous conditions.

The categories and subcategories outlined below are essential in forming a comprehensive safety analysis:

**EXEMPLARY MAJOR ACCIDENT CATEGORIES**

- **Equipment/Material Problems:** Issues with the tools, materials, or equipment used in operations can directly cause accidents. Identifying defective tools or equipment as a subcategory pinpoints a tangible area for improvement, such as regular maintenance and checks.
- **Procedure Problems:** Flaws in the procedures or how tasks are executed can lead to accidents. This highlights the importance of reviewing and updating operational procedures to ensure they are safe and effective.
- **Design Problems:** Inadequacies in the design of equipment, workspaces, or processes can create unsafe conditions. Recognizing this can significantly change how facilities and tools are designed to enhance safety.
- **Training Deficiencies:** A lack of proper training or certification can leave employees unprepared to perform their duties safely. This underlines the need for comprehensive training programs and ensuring all employees hold the necessary qualifications.
- **Management Problems:** Issues at the management level, such as inadequate safety policies or poor communication, can trickle down and affect the safety of all operations. Addressing these problems can lead to a more robust safety culture.

The subcategories included below, like pre-employment and pre-job evaluations (JSA), personal protective equipment, and adherence to federal/state standards and industry manuals, emphasize the multifaceted nature of safety. Each element, from ensuring the right personal protective equipment is used to verifying that all operations comply with legal and industry standards, plays a critical role in preventing accidents.

**EXEMPLARY SUBCATEGORIES**

- **DEFECTIVE TOOLS/EQUIPMENT,**

- **PRE-EMPLOYMENT EMPLOYEE EVALUATION,**
- **PRE-JOB/EMPLOYEE EVALUATION (JSA),**
- **PERSONAL PROTECTIVE EQUIPMENT,**
- **TRAINING/CERTIFICATION/LICENSES,**
- **FEDERAL AND/OR STATE STANDARDS/INDUSTRY STANDARDS,**
- **INDUSTRY SAFETY MANUALS AND PUBLICATIONS.**

Root Cause Analysis, through its thorough investigation and categorization of accidents, causes, and contributing factors, empowers safety professionals to not just react to accidents but to prevent them proactively. This approach is instrumental in building safer workplaces, minimizing risks, and ensuring that all employees have a secure environment in which to work.

# ROOT CAUSE ANALYSIS

## I. DATA COLLECTION

The following documents were reviewed in preparation for this preliminary Root-Cause-Analysis report:

**Deposition Testimony:**

- **NO DEPOSITIONS WERE REVIEWED FOR THIS REPORT**

**Miscellaneous documents:**

- **PLAINTIFF'S ORIGINAL COMPLAINT**
- **SCHEDULING ORDER**
- **SUPERVISOR'S INJURY REPORT**
- **EMPLOYEE INJURY/ILLNESS REPORT**
- **PHOTOGRAPH**
- **MR. PEDERO SANDERS – EMPLOYMENT FOLDER**

## II ACCIDENT DESCRIPTION

Mr. Pedero Sanders was employed as a Forman by Weeks Marine, Inc. and assigned to work aboard the ***JS CHATRY DREDGE***, a Cutter Head Dredge owned and operated by Weeks Marine, Inc. Mr. James Gates was Mr. Sanders' supervisor.

According to the Weeks Marine's accident reports, Mr. Sanders was exiting the supply shack when he stepped and tripped on the two shackles, "D" ring, and LOK-A-LOY connecting chain link attached to the skid of the supply shack. Mr. Sanders sustained his injuries at this time.

# III ASSESSMENT / OPINIONS

***The following preliminary opinions may be amended, added, or changed as other discovery and deposition testimony is provided.***

******************************************************************************************

## OPINION NO. 1

### EQUIPMENT PROBLEM

**WEEKS MARINE, INC. FAILED TO PROVIDE MR. SANDERS WITH A SAFE VESSEL UPON WHICH TO WORK BY FAILING TO REMOVE THE SHACKLE AND "D" FROM THE SHACK'S SKID.** Based on my education, training, and experience, I believe that the supervisors of Weeks Marine failed to remove the two shackles, the "D" ring and LOK-A-LOY connecting chain link, from the supply shack's skid after setting it up for service. The two shackles, the "D" ring and LOK-A-LOY connecting chain link served no purpose and created a tripping hazard at the entrance to the supply shack.

.



*****************************************************************************************

## INDUSTRY STANDARDS OF CARE USED TO AUGMENT MY OPINIONS:

***The following regulations are being used as a standard of care in my capacity as a safety professional.***

## CODE OF FEDERAL REGULATIONS
## TITLE 29 - LABOR
## SUBTITLE B - REGULATIONS RELATING TO LABOR
## CHAPTER XVII -- OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION DEPARTMENT OF LABOR
## PART 1910 - SAFETY AND HEALTH REGULATIONS FOR GENERAL INDUSTRY

### SUBPART D - WALKING-WORKING SURFACES

**1910.22(a) Surface conditions.** The employer must ensure:

**1910.22(a)(1)** All places of employment, passageways, storerooms, service rooms, and walking-working surfaces are kept in a clean, orderly, and sanitary condition.

**1910.22(a)(3)** Walking-working surfaces are maintained free of hazards such as sharp or protruding objects, loose boards, corrosion, leaks, spills, snow, and ice.

**1910.22(c) Access and egress**. The employer must provide, and ensure each employee uses, a safe means of access and egress to and from walking-working surfaces.

**1910.22(d) Inspection, maintenance, and repair. The employer must ensure:**

**1910.22(d)(1)** Walking-working surfaces are inspected, regularly and as necessary, and maintained in a safe condition;

**1910.22(d)(2)** Hazardous conditions on walking-working surfaces are corrected or repaired before an employee uses the walking-working surface again. If the correction or repair cannot be made immediately, the hazard must be guarded to prevent employees from using the walking-working surface until the hazard is corrected or repaired; and

*****************************************************************************************

## AMERICAN SOCIETY OF SAFETY ENGINEERS
## STANDARD FOR THE PROVISION OF SLIP RESISTANCE ON WALKING/WORKING SURFACES
## ANSI/ASSE A1264

**7. Housekeeping**

**7.1 General.** A housekeeping program shall be implemented to maintain safe walking-working surfaces.

**7.2 Maintenance Procedures.** If there are written procedures, they shall specify cleaning and maintenance procedures including immediate response, routine operations, remedial measures and reporting requirements.

******************************************************************************************

**DEPARTMENT OF THE ARMY EM 385-1-1**
**U.S. Army Corps of Engineers**
**CESO-ZA Washington, D.C. 20314-1000**
**No. 385-1-1 30 November 2014**

**SAFETY**
**SAFETY AND HEALTH REQUIREMENTS**

**SECTION 14**
**Material Handling, Storage and Disposal**

**14.D Housekeeping.**
**14.D Housekeeping.**
14.D.01 Work areas and means of access shall be maintained safe and orderly.
14.D.04 Tools, materials, extension cords, hoses, or debris shall not cause tripping or other hazards.
14.D.07 Form and scrap lumber and debris shall be cleared from work areas and accessways in and around building storage yards and other structures.

**SECTION 19**
**Floating Plant and Marine Activities**

**19.A.07 Safe practices.**
k. Projection and tripping hazards shall be removed, identified with warning signs, or distinctly marked with safety yellow.

******************************************************************************************

## FEE SCHEDULE:

Hourly charges are from portal to portal.
All expenses are reimbursed by the client.
$2100.00 for deposition and trial testimony (a minimum 3-hour charge, includes preparation time)
$350.00 per hour for all other services provided (fees are subject to annual increases).
$ 0.86 per mile for travel

The opinions found in this report are professional safety opinions relating only to this accident. While the expert opinions concern factual circumstances, which may be found by the trier of fact to constitute fault, they are not intended to be legal conclusions, as this is a matter for the court to determine and the trier of fact to decide. These opinions are based solely upon my many years of experience in the field of safety as it relates to this particular accident and should not be compared to other opinions in other cases.

If further discovery, research, inspections, and/or review should develop additional information that would alter my opinion, the conclusions reached herein would be subject to my revision and this report amended as necessary.

Sincerely Yours

Robert E. Borison
President
Total Safety Services, Inc.

# APPENDIX

## DEPOSITION TESTIMONY USED TO AUGMENT MY OPINIONS:

***This pagination may not follow the transcript of the official depositions.***

**MR. OWENS C. LEDANO TESTIFIED AS FOLLOWS:**

Page 7: Miss Nancy on June 19th, 2017.· Is that the correct

Page 32:A.·I have a boating safety course.· That's it. Q.·For example, do you have any coast guard licenses? A.·No, sir. Q.·Who gave you the boating safety course? A.·Wildlife and Fisheries. Q.·Okay.· Is that a recreational boating safety course? A.·I think so.

Page 35:Q.·Okay.· Tell me then what you would do on a normal day as an operator working Weeks Island. A.·We would get up in the mornings, eat breakfast

Page 36: and go downstairs.· They called it downstairs -- the building we would all meet and have a little safety meeting with Ms. Yvonne.· She was the head of our -- she was the lead operator for Alta Mesa.· She worked for them. Q.·Is that Yvonne Muffaletto? A.·Yes, sir.

Page 40:Q.·All right.· The wells on the bank that you occasionally interacted with, were those Alta

Page 41: Mesa wells? A.·Yes, sir.

Page 41:Q.·Okay.· All right.· How did you get to the wells when you would -- when you were in Weeks Island? A.·The ones on the water? Q.·Yes, sir. A.·We used the Miss Nancy, the boat. Q.·Okay.· Was that the only boat you used? A.·Yes, sir. Q.·How many operators were there on your hitch? A.·Who worked the Weeks Island field? Q.·Yes, sir. A.·There was five of us.

Page 41:Q.·Okay. A.·Two worked nights. Q.·Who were they?

Page 41:A.·DeShawn Stoutes. Q.·All right. A.·And Jake McGee. Q.·Okay.· And then three worked days? A.·Eric Bertrand worked -- he was an operator, but he stayed mainly in the office. Q.·All right.· And then who were the other two? A.·Me -- me and Myron Picou.

Page 42:Q.·Did you need any sort of Coast Guard license to operate the Miss Nancy? A.·No, sir.

Page 43:Q.·Okay.· And on the day of this incident, which we'll get to in a minute, my understanding was21·you were driving the boat and Myron was checking the well? A.·No, sir.· Myron was driving the boat that day.

Page 43:Q.·Okay.· Then why did Myron get off the boat to go check the well and you stayed on the boat?

Page 44: A.·Because he said the bilge was giving us problem and he told me would I mind going check it and he would go get the last numbers.

Page 44:Q.·Okay. A.·And he never got off the boat.· He was standing on the bow of the boat reading the numbers off the charts.

Page 46:Q.·Okay.· So were you and Myron the same position? A.·Yes. Q.·You weren't his boss? A.·No, sir. Q.·He wasn't your boss? A.·No, sir. Q.·Who did Myron work for? A.·He worked for Shamrock.

Page 46:Q.·And he was assigned to the Alta Mesa contract? A.·Yes, sir.

Page 46:Q.·Sorry.· Was she an Alta Mesa employee or a Shamrock employee? A.·No, she was an Alta Mesa employee.

Page 48:Q.·Okay.· Are you -- do you have any sort of training as a vessel mechanic or an engine mechanic? A.·No, sir. Q.·Okay.· How about vessel repair? A.·No, sir.

Page 96:Q.·Okay.· Why did the boat need to go to a welding shop the day after your accident? A.·Because it was leaking. Q.·Okay.· Was it leaking the day before your accident? A.·Yes. Q.·Did you know that? A.·Yes.

Page 96:Q.·Okay.· Why wasn't it repaired the day before your accident? A.·Because we kept on telling Ms. Yvonne the boat was leaking and we guessed that she -- being

Page 97: ·our boss, that she went and talked to her boss about it -- Alta Mesa.

Page 97:Q.·Okay.· How long had the boat been leaking prior to your incident? A.·I was told that boat was leaking for about 12 years.

Page 98:Q.·Okay.· So could you have asked them to do a rental boat prior to your incident when you were taking the boat out and knew there was a leak? A.·Uh-huh, (yes). Q.·Why didn't you? A.·We did ask

them. Q.·Who did you ask? A.·Ms. Yvonne. Q.·And what did she say? A.·She said that was way over her head and she couldn't -- she didn't want to talk about it no more. Q.·Okay.· When did that happen? A.·That was two months before the accident.

Page 99:Q.·Well how did the leaking cause your fall? A.·They had a piece of plywood in the back of the boat.· It got wet and when it got wet, it was slippery. Q.·What was the plywood for? A.·Alta Mesa put it in there to keep the drums from sliding when you carry drums to your -- to your platform to pump chemical.

Page 99:Q.·Right.· But what -- how does that address the leak?· My question was how does this leak that you were talking about -- how does that lead to you falling?

Page 100:A.·It wet the sheet of plywood.· The water had -- it had an inch and a half of water on top that plywood.

Page 100:Q.·So it wasn't oil on the plywood, it was water? A.·It had oil, water.· It had chemical on the plywood.

Page 100:Q.·Okay.· And so it's your testimony that the slippery -- slippery plywood which was caused to be slippery by oil on it and water from the leak is what caused you to fall? A.·Yes, and chemical.

Page 114:Q.·So why do you blame Alta Mesa for your incident? A.·Because they own the boat.· They was responsible for their boats and they should have fixed the leak when we started complaining about the leak. Q.·So where was the leak? A.·I just know it was in the back of the boat. I don't know where.

Page 115:Q.·Okay.· Were pictures of the boat with the plywood taken on the day of your incident? A.·Yes, sir. Q.·Who took those pictures? A.·Myron Picou went and took them with Steve Brown's company phone.

Page 115:Q.·All right.· So you kind of anticipated one of my questions and that is none of the photographs that you produced show any plywood on the deck of that vessel? A.·No, sir.

Page 116:Q.·Okay.· Did the plywood go the entire width of the vessel? A.·Yes, sir.

Page 116:Q.·Okay.· And you said it went aft all the way to the front of these jugs? A.·Yes, sir.· It went under the jugs.

Page 116:Q.·It went under the jugs?· Okay.· And how far forward of the X did it go?

Page 117:A.·It stops right here. (Indicating). Q.·Okay.· Where the -- where the deck appears to go from a darker color to a lighter color? A.·Yes, sir.

Page 117:Q.·All right.· So if I draw a line from this point over here, would that accurately reflect where you think the plywood ended? A.·Yes, sir.

Page 117:Q.·I'll put plywood ended and draw an arrow to right there.· Okay? A.·Okay.

Page 118:Q.·And I want to make sure I understood your testimony.· On Ledano #3, there's a hole -- a circular hole in the deck? A.·Yes, sir. Q.·That deck plate can be raised up? A.·Yes, sir. Q.·Below that hole is where the bilge pump is? A.·Yes, sir.

Page 121:Q.·Okay.· All right.· So you and Mr. Picou leave the dock and you go to how many wellheads before you get to Wellhead 832 in Weeks Island?· If you recall. A.·We went to eleven (11).· That was our last one.· That would have been number 12.

Page 121: Q.·Okay.· What time of day did this happen? A.·8:00 that morning.

Page 122: Q.·So you get up alongside Wellhead 832? A.·Yes, sir.

Page 124: Q.·Myron then leaves the command station and walks forward to where he's standing at the time of your fall? A.·What he did was when we pulled up there, the hose right here (indicating), the water come met us inside the living quarters -- inside the quarters of the boat -- inside the -- in the -- Q.·In the cabin? A.·In the cabin.· I couldn't think of cabin. Q.·Okay. A.·It hit us at our feet.· He turned to me and he said I got the bilge on.· I said well, you want me to go check it out?· He said yes, why don't you go check out the bilge and I'll get the last numbers.· I said okay.

Page 125:Q.·So you left where you were seated and you went and sat at the controls? A.·No, sir.· I walked out to the back of the boat -- Q.·Yeah.· To check the bilge pump? A.·-- to check the bilge. Q.·All right. A.·And I had -- I had to kneel down, reach under and pull the -- this cover off -- Q.·The plate? A.·-- the plate. Q.·Yeah.

Page 125:Q.·Okay.· And then -- that's all right.· Then what? A.·I picked it up.· It had debris in it, like

Page 126: leaves.· I took the leaves out, put it back down, it started suctioning.· So as I stood back up, turned to walk, that's when I spun like this to walk and this right leg -- my foot -- my foot when I pushed to walk, it slipped.

Page 126:Q.·Okay.· And then you stood up and you said you were turning to your left? A.·I turned -- yeah, to my left.

Page 126:A.·My foot -- my foot slipped.

Page 127:Q.·So to keep from hitting that, you did what? A.·I lunged forward and when I did, my right shoulder caught the door -- caught the inside of the door right here. (Indicating) Q.·Okay. A.·And the door handle -- this part (indicating) -- caught me in my back.

Page 170:Q.·You've got the five operators, right? A.·Yes. Q.·And that's you and the four other Shamrock guys, correct? A.·Yes. Q.·And then above y'all, is Ms. Yvonne y'alls direct supervisor? A.·She was our lead operator.· That's who we answered to. Q.·All right.· Her title was lead operator? A.·Yes. Q.·So on a daily basis, she's the boss, is that right? A.·Yes.

Page 171:Q.·Okay.· Who is Ms. Yvonne's boss? A.·If I had to guess, I want to say Troy Mudd. Q.·Okay. A.·Or -- and then they had Jamie Delavoux.· He was over everybody.· So I really don't know who she answered to. Q.·Okay. A.·I'm just guessing here.

Page 203: Q.·What caused you to lose your footing? A.·The plywood being wet, slippery with oil and chemical. Q.·Okay.· And what caused the plywood to become wet? A.·With the boat taking on water, leaking -- the Miss Nancy.

Page 204:Q.·Let's talk a little bit more about the plywood.· What was the -- to your knowledge the purpose of the plywood covering the back deck of Alta Mesa's boat?· Why was it there? A.·I was told it was in there to keep the drums from sliding when they put iron drums of chemical in the boat. Q.·Who told you that? A.·Ms. Yvonne did, Alta Mesa.

Page 204:Q.·Okay.· When the plywood was dry, was it slippery? A.·No, sir. Q.·And when -- only when the plywood would become wet from the leaking boat would it become slick, is that right? A.·Yes, sir.· Become slick and slippery.

Page 205:Q.·And on this particular day, how much water had accumulated on the back deck of the boat? A.·About an inch and a half.

**MR. ERIC BERTRAND TESTIFIED AS FOLLOWS:**

Page 12: Q Yes, the date the accident happened, June 19 of 2017. A Oh, Shamrock. Shamrock. Q Shamrock. Okay. And were you working under contract with another company? A I was working contract to Alta Mesa Holding.

Page 12: Q On that date, you were assigned to the Weeks Island Field; is that right? A Yes, sir. Q That's in Iberia Parish?

Page 13: Q Okay. Were some of Alta Mesa's oil and gas wells actually out in Weeks Bay? A Vermilion Bay, yes, sir. Q In Vermilion Bay?

Page 14: Q Okay. On June the 19th of 2017, what was your

Page 15: job title? A Production operator.

Page 15: Q Okay. And is it correct that Owens Ledano and Myron Picou were part of the red crew? A Yes, sir.

Page 16: Q Who was your direct supervisor? A Yvonne Muffoletto. Q What was her job title? A Our lead operator.

Page 17: Q Who was she employed by? A Alta Mesa.

Page 17: Q Who was the next person up the chain of command above Ms. Muffoletto? A Troy Mudd. Q All right. What was Mr. Mudd's job title? A I would say, I think they considered him as

Page 18: our field foreman.

Page 19: Q Who was the next person in the chain of command over Mr. Mudd? A The superintendent was Mr. Jamie Desavo.

Page 19: He was our superintendent.

Page 22: Q Were you assigned to a specific boat around the time of June 19, 2017? A I didn't go on the water very much, but our field was assigned the MISS NANCY.

Page 23: Q How long -- were there any other Alta Mesa boats available for you to use at the Weeks Island Field if you wanted to? A No. Q MISS NANCY was it? A Yeah.

Page 25: Q I'll represent to you, sir, that Mr. Ledano testified that during a normal 12-hour shift he would work at least nine hours aboard the MISS NANCY. A Yes, sir.

Page 28: Exhibit Number 1.

Page 29: A (Witness examines document.) We're looking at the MISS NANCY right here --

Page 29: A -- with a drum of chemical on the back of it.

Page 29: Q When you operated it, is it correct that you'd be responsible for checking the oil, checking the fuel, running lights, before you -- before you took off? A Yes, sir. Q You and the other operators would be responsible for loading and unloading equipment to and from the boat? A Yes, sir.

Page 29: Q Would y'all be responsible for kind of trouble shooting minor maintenance issues aboard the boat, or was that turned over to mechanics?

Page 30: A Minor, minor stuff, yeah. But anything else, we'd report to Ms. Yvonne, and Ms. Yvonne would report to a mechanic --

Page 30: Q Okay. A -- you know. But nothing -- nothing major, it had to be minor.

Page 30: Q Got you. Okay. To your knowledge, were the mechanics who worked on the MISS NANCY direct employees of Alta Mesa, or some other company, or a mixture of both? A We had some direct Alta Mesa ones, employees, and we had some that was also third party through Shamrock.

Page 31: Q Okay. But at some point, Alta Mesa -- A At some point, yeah, we all had to take a boater safety course. Q That was required by Alta Mesa? A Yes, sir.
Page 31: Q I'm going to hand you a copy of a document. It says, Alta Mesa Services, LP, Monthly Boat Report. The month is June of 2017. The boat name is the MISS NANCY.
Page 33: Q Got you. So you all's job as operators was to verbally report -- A Yes. Q -- to Ms. Yvonne -- A Exactly. Q -- any potential issues, problems, safety concerns about the vessel? A Yes, sir.
Page 34: Q You think there's information missing? A There's a lot of information missing on here (indicating). Q Okay. A All of these days right here (indicating), there should have been leak in the boat. But all they got on here is boat out of water for repairs. And that's on the -- the 20th.
Page 34: Q About what you just said. You said on all of this information right here, it should have had something about leaking -- leak in boat. A Yeah, because that boat -- they reported that boat leaking probably months and months, probably. And, you know, I was -- I never had to report it because I wasn't on the water very much, it was always reported. But every
Page 35: day they should have had a leak on this paper right here (indicating). You know, the boat was leaking, taking on water or something. But there's none of that on there.
Page 35: Q Okay. When you said they reported it, who reported that issue, to your knowledge, to Ms. Yvonne? A Mr. Owens reported it, Mr. Myron, Mr. Sean Stutes. And I'm not going to say the other name because I can't remember if it was Philip or not. But I know for sure them three people right there reported it, because they was the ones 90 percent on the water.
Page 35: Q -- which might seem silly to you. Okay? But how do you know they reported that to Ms. Yvonne? A I was in the office numerous times whenever they come off the water and they told her that they had to pump the boat out that day, it was leaking, that it needed to be fixed, you know, numerous times.
Page 36: Q Why is that important to you? A Why is that important, because this accident could have been prevented. You know, the boat should have been fixed. It should have been on there, got to the mechanics and let them fix it, or the boat should have been pulled out of service, but -- Q And whose responsibility is that? A Alta Mesa's responsibility for that.
Page 37: Exhibit
Page 37: Number 3.
Page 37: Q Is that how the back deck of the MISS NANCY looked on June the 19th, 2017? A (Witness examines document.) No.
Page 38: Q How is it different? A It's missing a piece of plywood. Q Okay. And that is what both Owens and Myron testified to as well. Okay. They testified that on the back of the MISS NANCY on that day, and for a long time before that day, Alta Mesa had a piece of plywood across the back. A Yeah, they had a piece of plywood on there since I started there in 2011.
Page 38: Q To your knowledge, why was there plywood on the back deck of the boat? A For me, the way they explained it to me, it
Page 39: was kind of from keeping the boat getting dented and this and that. You know, by putting heavy drums and heavy equipment in the back of it, it'll keep the boat from getting dented.
Page 39: Q All right. How large was the piece of plywood on the back deck?
Page 40: A Oh, it fit just as wide as the -- it was the same size as the back deck.

Page 40: Q Okay. So if you were trying to walk from the outboard engine to the cabin, you would have to step and take steps on the plywood? A Yes, sir.
Page 40: Q During the time that you were working in the Weeks Island Field, from 2011 up until Mr. Ledano's accident, did Alta Mesa ever change out that piece of plywood? A I can't recall. Like I said, I couldn't tell you. Q Okay. A I know it was an old piece of plywood.
Page 41: Q Yes, I guess that's -- okay. So the plywood was used as, I guess something to set drums of chemical on; is that right? A Yes, sir.
Page 41: Q Was it used to set drums of anything else on it, or just chemical? A You had drums of soap, you had drums of chemical. Pretty much soap and chemical, yeah.
Page 42: Q Okay. In doing so, would it be, I guess, common for chemical to spill out onto the plywood? A Yes, sir.
Page 42: Q And over time, based on what you saw, would that chemical eventually soak up into the wood? A Yes, sir.
Page 42: Q Okay. What about oil and grease? A Yes, sir. And I was considering that, I guess 42
Page 43: that's chemical.
Page 43ANN: Q Yes. Fair enough. I just want to make the record clear. And, you know, as someone who's worked out there since 2011, was the plywood on the back deck of the MISS NANCY, based on what you saw, soaked with chemical, grease and oil, long before Mr. Ledano's accident?
Page 43: A Yes, sir.
Page 43: Q And in your experience, what would happen when the plywood that was soaked in chemical, grease and oil, would get wet? A It would get slippery, very slippery.
Page 43: Q Okay. Which leads me to my next question. All right. Was the back deck of the MISS NANCY wet on a regular basis before Owens' accident?
Page 43: A Yes, sir.
Page 44: Q And why is that? A Because the boat was leaking water, taking on water and you had to pump it out every day. So that overnight, you know, or whatever, you know, it'd get water in there and saturate it to the board, the board would be wet all the time. Q Okay. Tell me about the boat leaking.
Page 44: How long was that a problem before Mr. Ledano's accident? I can't give you a direct date, but it was -- I'd say months. I can't tell you exactly how many months. It was -- been a long time.
Page 45: Q And I might ask you -- this might be common sense. I'm going to ask you anyway. Okay. When you have a piece of wet, slippery plywood in the back of a work boat, is that something that you would have considered to be a slipping hazard?
Page 46: A Yes, sir.
Page 46: Q Is that something, to your knowledge, that was reported to Alta Mesa before Mr. Ledano's incident? A Yes, sir. Q On numerous occasions? A Numerous, yes, sir.
Page 50: Q Okay. Did you ask him -- did you talk to him, like, hey, man, what happened? A You know, we kind of talked about it. He was telling me that the -- you know, the plywood
Page 51: was slippery and he slipped, and he messed up his shoulder. But other than that, you know, that's pretty much all we talked about.
Page 61: Q Where was the leak? A The leak was in the back of the boat, in the back, coming like through the hull. Q Okay. Through the stern or side? A I think it was the stern.

Page 80: Q Okay. And you mentioned right at the beginning, but your understanding of the relationship here was that you're an employee of Shamrock -- A Uh-huh (yes).
Page 81: Q -- contracted to Alta Mesa, right? A Yes, sir. Q And was it your understanding that Alta Mesa paid Shamrock -- A Uh-huh (yes). Q -- for your work? A Yes, sir.
Page 86: Q All right. Do you know whether the safety man in y'all's field was a Shamrock or an Alta Mesa employee? A Shamrock.

**MR. STEVE BROWN TESTIFIED AS FOLLOWS:**
Page 11: Q Okay. On June 19, 2017, who was your direct employer? A Shamrock Construction.
Page 11: Q Okay. And I understand that a crew of guys who were directly employed by Shamrock were working under contract with Alta Mesa. A Yes, sir.
Page 13: Q The Alta Mesa job, what field were you assigned to; do you remember? A I wasn't assigned to any field.
Page 14: Q You were a safety medic assisting all the fields. A All, yes, sir.
Page 21: Q Who did you report to, if anybody? A I reported to -- like I said, Eddie Sonnier from Shamrock. But while I was there, I would communicate with Mr. Troy and Mr. Joe. They were the supervisors that were there. Q Troy Mudd? A Troy Mudd, yes, sir. Q Okay. And is it Joe or is it Jamie? A It was Joe. Joe was the other supervisor with Troy. And then, Jamie was the -- the -- I
Page 22: guess the operations manager, or that head -- head person for Alta Mesa that was there. He would give directives periodically.
Page 26: Q Okay. You mentioned one of the areas where your photographed was wood on the back of the
Page 27: deck where Owens said he slipped. A Yes, sir.
Page 27: Q As we sit here today, do you have a mental image of kind of what that wood looked like? A I think it was plywood.
Page 27: Q Okay. What kind of shape was it in?
Page 28: A Okay. It -- it looked wet and used. Deteriorated, I guess is a better word. Q Dirty? A It had some debris on it, if I recall.
Page 28: Q I'll represent to you that Owens and Myron both testified that the plywood had like chemical and oil and grease kind of soaked into it. Is that -- A Yeah.
Page 28: Q -- what it looked like to you?
Page 29: Q Okay. And you know, their description of it being soaked with chemical, that's not inconsistent with what you observed?
Page 29: A No, because I watched during my -- they were -- the boats that they used were right outside my office.
Page 32: Q Okay. And that wet plywood that looked old and the way you described it, that's what Mr. Ledano told you he slipped on? A Yes. What he said was -- if you'd like me to -- what I remember. I'd like to read what I wrote back then. But without reading the actual footage right now, what I remember is, they were at a bulkhead, wherever they were at. Mr. -- Q Picou? A -- Picou got out of the boat. He was on top of the grating doing his checks on valves. Mr. Ledano was in the boat and noticed the water was creeping up by his feet again. So he bent down to unclog the sump pump, or the

Page 33: pump that's in the bottom that pumps the water out. Q Bilge. A Bilge pump, I'm sorry, yes, sir. And he had some leaves that he took out of the bilge pump and threw them over. And when he went to get up, his feet slipped on the -- on the plywood. Q On the wet plywood? A Yes, sir. And he fell forward -- Q Okay. A -- hitting the cabin area with his shoulder.

Page 48: Q Mr. Brown, there's been -- let me ask you this: Did you have any knowledge of issues with the MISS NANCY leaking, or taking on water, before Mr. Ledano's incident happened? A Yeah. On several -- I shouldn't say several. On a few days in these early morning meetings, they questioned whether they were to get the boat fixed. Because on cold days, they had, you know, water that wouldn't -- water was coming from somewhere. And I just -- I vaguely remember a comment being made, Jamie's not ready to have it fixed yet,

Page 48: we got to wait for another boat to come back.

Page 48: Q And you recall who specifically reporting that the MISS NANCY was having issues taking on

Page 49: water? A I remember Mr. Picou saying it a few times and saying that the other shift told him it was leaking, or something. And he noticed that there was water coming from somewhere, that might needed to be welded or something. I'm not 100 percent sure on where the leak was, or what it was. But I do remember them saying several times that there -- there was water, that their feet would get wet.

Page 49: Q Got you. That's not something that you personally inspected? A No, sir.

Page 50: Q Okay. And you recall those issues being reported on more than one occasion before Mr. Ledano's accident? A Yeah. I don't know how many times. I mean, -- but yes, I remember hearing it in the morning meeting.

Page 51: Alta Mesa direct employees were present in that meeting?

Page 51: A Yes. Sometimes either -- either Mr. Joe or Mr. Troy, Ms. Yvonne. Or if they were absent, Eric would have the meeting.

Page 51: Q And what do you recall Alta Mesa employees saying in response to those complaints about the boat taking on water? A They would get with Jamie.

Page 51: A They would get with Jamie. I'm not sure if he had to sign the ticket, if he had an invoice. I don't know anything like that particular. But I just -- I remember the mechanic saying it a few times, and other employees saying Jamie has to approve the boats to go out to get repaired.

Page 56: Q And you mentioned you had visualized, you saw personnel wiping spilled chemical from the plywood before. A Yes, sir. And the only reason I know that is because I went and got garbage bags. And they used that absorbent pad, a white absorbent pad like they use in chemicals spills, and they would wipe it up with that. And then, we'd put it in a trash bag to properly dispose of it, so it wouldn't go flying in the bayou, or whatever, behind the office there.

Page 56: Q Got you. If Mr. Ledano and Mr. Picou testified that when the plywood on the back of the deck of the MISS NANCY would get wet it would become slippery, you wouldn't have any reason to dispute that?

Page 56: A No.

Page 58: Okay. And when you inspected the MISS NANCY after the accident and took photographs, was there any non-skid on the back deck? A No, sir. Q Was there any non-skid on the wet plywood that you took photographs of? A No, sir. Q Okay. And explain to us in more detail your opinions about that, and what you included in your report and discussions with Mr. Jamie. A Well, I just said that, you know, we

had a space that was slippery, wet, with no anti -- you know, maybe we could get some anti-resistant slipping on that. And the next day I went off. And when I came back, the plywood was out of the boat. Q Okay. Would it be fair to characterize -- wait. Let me scratch that. Did you have a verbal discussion with Mr. Jamie about that issue? A Yes.

Page 59: Q When did that take place? A I don't know what day it was. He got hurt on Monday. And I think it was when I came back and I turned the pictures in to Ms. Tammy, he was in his office right behind hers. And he said, how he's doing? I said, well, he's pretty hurt. And I said, here's the pictures. I said, do you think we could get some anti-skid tape on that deck so this doesn't happen again, something to that effect. Q Okay. And is that also information that you included within your written report? A I don't know if I wrote on the side of the picture and compared that to that (indicating), saying no skid tape. I don't -- I don't recall. I would have to see my report on what I wrote. Q Okay. A The one I turned in. Q Did you also include that in an e-mail -- A I don't recall. Q -- in writing? A I don't recall 100 percent on whether that was in the e-mail or not. I took the pictures and wrote things on the pictures. I would have to

Page 60: read the report at this point. Q Okay. And what did Mr. Jamie tell you in response? A He said, we'll -- we'll get to it. Q As the owners of the Alta Mesa -- excuse me, the MISS NANCY, do you think it is the responsibility of Alta Mesa to ensure that its boat is safe to work upon? A Yes. I think it's the responsibility of the -- of the company. But I also think there's some responsibility of the people using the boat. And as far as I know, they were reporting this issue. Q Okay. And so, again, based on your experience, the crew was doing what they were supposed to do, following proper protocols by reporting the hazard up the chain to Alta Mesa? A As far as I know, yes, sir.

Page 61: Q As a safety man, that's what you would recommend that they do? A Yes, sir. Q As a safety man, do you believe that wet plywood on the back of a work -- the back deck of a work boat is a safety hazard? A Yes. A I've worked in the offshore industry as I noted earlier, and the boats that we traveled on could have no wood in the back of them. They had to have anti-skid tape because we were lowered to those decks and they wanted proper footing. Q And what companies were that that had those safety rules? A The -- I'm assuming the vessel owner that -- we used to get contracted boats taking us out to the rigs in whatever countries we were in, when I was working. Q What were the various companies you were working for? A I worked -- I worked for Diamond Offshore

Page 62: offshore, but I was in several different companies -- several different companies -- countries during my work, my two and a half years there. And they may have -- I'm just going to use for example, Chouest Offshore Boating, they may have Jones Offshore Boating. Whoever the boating company was, I had never seen wood like that in a boat used offshore. Q Okay. And if the cause of the plywood becoming wet in the back of the boat was a leak in the boat, such that it took on water and caused the plywood to become wet, in your experience, would you consider that leak in and of itself to be a contributing factor tothe safety hazard? A I would have wrote that and communicated that that could have been a cause for him slipping in a report, for a safety report, yes. Q Yes. I mean, I guess to put it in laymen's terms, right, if the boat leaks, that means water is coming in, right?

Page 63: 1 A Correct. Q And if water coming in the back deck is causing the plywood to become wet -- A It's a hazard. Q Right. A And that's -- that's -- when I mentioned it to Mr. Jamie, I was just trying to eliminate that hazard in the future -- Q Correct. A -- down the road. Q So based on your firsthand

knowledge, do you believe that Alta Mesa knew that the MISS NANCY had an issue with taking on water prior to Mr. Ledano's accident? A Yes. Let me clarify that. Employees of Alta Mesa knew that there was a leak and there was a problem with the boat leaking prior to his incident. Q Okay. Management level employees? A Yes. Q Okay. Do you know if Alta Mesa direct

Page 64: employees performed routine inspections of the MISS NANCY, or any other boats? A I don't know specifically. I've never seen Ms. Yvonne in the boat by herself. And I've never seen Mr. Troy or Mr. Joe get in the boat by themselves. So I would have to say no, I haven't seen that. Q Okay. Did you ever see Mr. Troy, Mr. Joe, or Ms. Yvonne in the MISS NANCY with other people? A There were so many boats, I can't definitively say yes. Q Okay. Did all the -- did every boat that you saw -- did every -- scratch that. Were all of Alta Mesa's boats equipped with the plywood on the back deck that you saw? A Not that I recall. Q And what is, to your knowledge, the potential hazards associated with slippery, wet plywood on the back deck of a work boat? A Personal injury, death, bodily harm. Q Okay. In your experience, is that a major safety hazard?

Page 65: A Say that again. Q Sure. Well, I mean, you mentioned that, you know, the potential hazards associated with a wet, slippery plywood on the back is personal injury and death. A Yes. Q So I'm just asking if, in your opinion, that would be a major safety hazard? A Oh, yes. A Yes. Q In this particular case, what did Owens tell you was the cause of him slipping and falling on the back deck? A If I could see the report that I wrote for Owens at this time. Because when he got hurt, he couldn't write, so I wrote it based on what he told me at the time. And as I recall -- but I would like to

Page 66: specifically see that writing. I recall that, like I said earlier, Mr. Picou was up on the platform doing his inspections. Mr. Owens was in the boat. He bent down into this area on -- I guess this would be Exhibit 2, and -- excuse me -- the pump is under here (indicating). He explained that he was cleaning out leaves from that, and when he stood up, he slipped on the wet plywood, falling forward. Q Towards the cabin? A Towards the cabin.Page 73: Q What was his story? A That he was under, getting leaves out the bilge pump, trying to get the leaves out, when he stood up, he slipped on the -- the wood in the back of the boat, and fell towards the cabin.

Page 88: Q I'm going to show you a copy of an incident report that's been produced to me, and I want to know if this is the one that you've been referring to. Okay?

Page 88: Q And the highlighting is mine, so -- A (Witness examines document.) This is not -- this is not the incident that I wrote. I'll read it, but it's not the -- it was handwritten.

Page 89: For the record, Mr. Brown, when you were talking -- testified earlier about filling out a report, what I just showed you and what's attached as Exhibit Number 3 is not it. Is that a fair statement? A Yes, sir.

Page 90: Q Okay. The report that you completed, is that -- was that included in the e-mail that you sent to the Alta Mesa supervisors that you described earlier? A No. I just did an initial notification that he was injured. And then, I printed out the pictures. But I remember handwriting the report. I helped Owens handwrite, and then I wrote a short description and had pictures attached to it. Q What were the pictures of? A The MISS NANCY boat, the plywood, him with the sling and swathe, if I'm not mistaken. Q Okay. And that's what was e-mailed? A I don't know if I e-mailed it or if I printed it out. But at some point, the notification was e-mailed because it wasn't filled out on a computer. I didn't fill the report out on a computer. It was handwritten. And I downloaded pictures and put -- I think I put, if I'm not

mistaken. I'm not totally clear on how I did it, but it was turned in to Ms. Tammy. Q Okay. You're positive you turned that in to Ms. Tammy?

Page 91: A Yes. Q That's the Alta Mesa office manager? A Yes. Because when Mr. Eddie came by, I asked him if he got a copy of the report, and he said, Tammy has it and I haven't gotten it yet. Q Did your report -- you mentioned you had photographs of the back deck of the MISS NANCY, the wet plywood, et cetera, correct? A Yes. Q Did you have comments, or opinions of your own, written into that report? A I think I put -- I don't know if it was on the picture, if I wrote it out, or if it was in the description. That's why I wanted to see the report that I did for them of, you know, slick deck with a little arrow; no anti-skid tape; point of impact, pointing to where it was; bilge pump area, that kind of stuff on it. Q Okay. Where you wrote "slick deck", where were you pointing to? A To the deck where the plywood was in the back of the boat. Q And where you wrote "no anti-skid", where were

Page 92: 1 you pointing to? A To the -- I'm sorry. To the deck plywood that was on the back -- where the plywood was on the back of the boat here (indicating). Q On the back of the MISS NANCY? A Yes, sir.Page 100: Exhibit

Page 99: Q Okay. Under the chief complaint, it says, "slipped and hit right shoulder on door frame". A (Witness examines document.) Yes, that's -- that's not my handwriting.

Page 100: Q Is that your handwriting? A (Witness examines document.) Yes. Q Okay. Can you tell me what this document is? A This is what he told me happened. And he

Page 101: dictated it and I wrote it for him because he could not write. Q Okay. And this is the one that was done -- A Let me make sure. Q I'm sorry. A (Witness examines document.) Yes. This is the one that was written in his words and I just documented what he told me to write. And then, he signed it the best he could.Page 102: Q Okay All right. I want to point out one sentence. It states, I was on my knees while working in the bilge, and I stood up, turned around and started to walk. While walking, I lost my footage and fell forward. What was it that Mr. Ledano told you was the cause of him losing his footage? A Slipping on the -- the wood. Q Okay. A And if you notice the punctuation in that, I wrote exactly what he said.

Page 105: Q Okay. Let me ask you this: Based on your understanding of the relationships between Shamrock and Alta Mesa on that job, do you believe that Shamrock had the authority to make any alterations to Alta Mesa's equipment?

Page 105: A No. And Mr. Jamie said on several occasions that we don't alter anything. You get his permission before anything is altered.

Page 105: Q Okay. And so, Mr. Jamie, again, that's the Alta Mesa -- A Operations manager --

Page 115: Q Okay. And he didn't anything about slippery, or wet, or oily, or greasy plywood, either, did he? A No. But he did in the truck and he did initially.

Page 116: Q Okay. Now, look at Exhibit Number 3 for a second. That's the Alta Mesa report. A (Witness examines document.) Yes, sir. Q Go to Page 5. I think it's 5.

Page 117: Do you see the signature up there and the name above it? A Yes, sir. Q All right. Is that who prepared this report? A I'm assuming, because I -- I did not type this report. And what she told me was she would type the report for Alta Mesa. Q Okay. And what her sources of information were when completing this report, you don't know? A I -- I gave her -- I gave her some pictures and a little written statement of what I took the pictures of. Q Sure.

Page 125: Q Okay. So if somebody reported a hazard to you, part of your job duty was to make sure that hazard was addressed. Not necessarily do it yourself, but make sure it was addressed. A Make sure somebody of authority knew about it. Q Okay.

Page 126: Q And then, did you have any duty to follow up to make sure that once the authority knew about it, that it was addressed? A No.

Page 127: Q Okay. So you're in a meeting and you hear that the boat's leaking. And either Troy or Jamie is there, and you know that they've heard this information. Okay? A (Witness nods affirmatively.) Q And then, some time goes by, and you hear the same complaint again, whether it's a leaking boat, or whatever it is, and you know from the first meeting that they know about it. Does that then --

Page 128: Q That's okay. Does that then put any duty or -- on you to follow up to make sure that's been addressed?

Page 128: Q Because you knew they heard about it earlier, and now you're hearing that it still exists.

Page 128: A Yes. And I've -- I've followed up with Mr. Troy and Jamie on that issue, and they said they didn't have a boat to replace it, that it would be done when they could get to it.

Page 129: Q Okay. Did anyone at any time in your employment out at Weeks Island, prior to Mr. Ledano's event, ever complain to you about the slippery plywood on a vessel? A Maybe Eric. Q Okay. Before the event? A Yes.

Page 133: Q My question is: Was the description of that vessel's condition to you, did it ever reach a level that you thought it should be taken out of service? Whether or not you had the authority to do it is another question. A No.

Page 133: A No, based on -- they said the bilge pump pumped out the water when -- when it was leaking.

Page 134: Q You said that employees of Alta Mesa knew there was a leak on this vessel. And which -- you're talking about Troy and Yvonne? A I'm talking about Jamie knew.

Page 135: Q Jamie. A There was a day, and I don't remember when it was. There was days that Jamie would come out to the shop and watch Ricky, or talk to Ricky while he was working on the boat, and -- and different boats. And there was conversations where he knew there was a leak on the boat. Q Okay. Shamrock hands knew there was a leak on the boat, too, didn't they? A Yes, sir. Q And that includes Mr. Picou? A I believe so. Q That includes Mr. Ledano? A I believe so.

Page 135: Q Does that include you? A Yeah, because I heard it in a meeting. Q Okay.

Page 149: Looking at Exhibit Number 3, the incident -- the Alta Mesa Incident Report. Again, this is not the report you prepared, right? Right. It says the person completing this report is

Page 150: Tammy Myers, office manager. A That's correct.

Page 150: Did the Alta Mesa incident report prepared by Ms. Myers include any of the information thatyou provided to her about the slippery deck, the wet plywood, anything along those lines?

Page 150: A (Witness examines document.) I don't see it in here (indicating). don't see it in here (indicating).

Page 150: Q Okay. And in terms of the photographs that you e-mailed to the Alta Mesa people, including Ms. Myers, on

Page 3 of the report, it asks about photographs. And where did Ms. Myers put the X mark? A No. Q Okay. Is that accurate, in your information? A No. Q Why? A Because I gave her photos.

Page 152: Q Okay. In response to some of Skip's questions, you mentioned that you brought up the problem of the MISS NANCY leaking to Jamie and Troy. That's something that you brought up to them directly, correct? A Yeah. They were in the maintenance shop and the mechanic, Mr. Leboeuf, was working on the

Page 153: truck. And they'd be out -- like I said, they'd be out there two or three times a week, when I'd come back and I'd walk in there, tell them hello, whatever. And, you know, at -- at one point, I said, they brought up that boat again, MISS NANCY. He said, I'm working on it. Okay.

Page 153: A Mr. Jamie.

Page 153: Q And that was after the issue was brought up to Alta Mesa supervisors in the morning safety meeting; is that correct? A Yeah. Before this incident ever occurred. Q That was my next question. And so, your personal reporting of the problem to Jamie in the shed was before Owens' accident? A Yes. Q And when the issue was specifically brought up in a safety meeting with Alta Mesa

Page 154: supervisors, again, that was before Mr. Owens' accident?

Page 154: A Yes.

**MS. YVONNE MUFFOLETTO TESTIFIED AS FOLLOWS:**

Page 12: Q Who did you last work for? A Alta Mesa.

Page 17: Q All right. And you were assigned to the Weeks Island Field; is that right? A Yes. Q Alta Mesa owned and operated various oil and gas wells located in the Weeks Island Field? A Correct.

Page 17: Q Okay. Your job title on the day of Mr. Ledano's accident was a lead operator; is that correct? A Correct.

Page 18: Q Okay. And those operators were employed by -- direct employees of a company called Shamrock; is that right? A Shamrock, yes.

Page 18: Q Okay. Do you remember Owens Ledano? A Yes, sir. Q Do you remember a guy by the name of Myron Picou? A Yes. Q I think people called him Myron Dean. A Yes. Q Sean Stutes? A Yes. Q Eric Bertrand? A Yes. Q Were those the guys that you recall as being the contract operators? A Yes.

Page 20: Was your direct supervisor a guy by the name of Troy Mudd? Yes. Okay. And he was a field superintendent; is that right, or a field foreman? A field foreman.

Page 21: Q I guess my point is: To your knowledge, he wasn't a contract -- A No. Q -- person? Okay. He was employed by Alta Mesa? A At the end, yes. Q All right. And who was next in charge over Mr. Mudd? A In charge of Mr. Mudd? Q Who was the next person in the chain of command over Mr. Mudd? A (No response.) Q We've got the name of a Jamie Desormeaux. A Jamie. Yes, Jamie. Q Okay. And what was Jamie's job title? A He was in charge of everyone.

Page 36: Q So you were responsible for also filling out daily production reports? A Uh-huh (yes).

Page 40: Q Okay. So if a safety issue was brought up in a safety meeting, would it be the responsibility of Jamie or Troy to address the safety problem?

Page 41: A Correct. We had -- we would write the JSA. We would tell it to him. And then, at times, he would talk about it at the safety meeting. And then, we would -- if we could fix it -- which I say we, the crew could fix it, we would do it.

Page 47: Q All I'm asking about is, was there paperwork for the weekly safety meetings? A There was. Q Okay. That's the only thing I'm asking you. Okay. A We would sign some paperwork. We had papers to sign if we attended the safety meeting.

Page 47: Q Thank you. All right. A And then, it was given to the young lady, or whoever was -- Troy, or whoever. And if she wasn't there, he would take it to her, and she would file it.

Page 50: Q As a lead operator, you were responsible for inspecting Alta Mesa's equipment for any potential safety hazards or conditions? A Yes, sir.

Page 50: Q Okay. As a lead operator, what was your responsibility if a contractor reported a potential safety hazard to you regarding Alta Mesa's equipment? A I stopped the job and reported to upper management, which would have been Jamie or Troy.

Page 53: Q Do you remember one way or the other? A I remember the MISS NANCY. Q Okay. A But we had -- it all depends which boats were running. I mean, we had -- we had another one. Then, we had a work barge, and there was another boat that -- I don't remember that name. Then, they'd bring in a rental every once in awhile.

Page 54: Q Alta Mesa owned the MISS NANCY? A I don't know. I would -- I would -- all I did was go into the boats, and check them out, and clean them out. And that's something that they would always neglect, so I'd go there

Page 55: and -- Q So you were responsible for cleaning out the boat? A No, sir, I wasn't responsible -- Q Did you -- A -- I would just do it. Q Okay. Well, did you make it your responsibility by undertaking that duty? A Yes, sir.

Page 55: Tell them what? The boat needs to be cleaned. Okay. And you said that you did that as well? If they don't do it, yes, sir.

Page 55: Q Would you agree that Alta Mesa was responsible for providing its contractors and employees with a safe boat upon which to work?

Page 55: A Yes, sir.

Page 56: Q Alta Mesa was responsible for inspecting its boats for potential safety hazards? A Yes, sir. Q Alta Mesa was responsible for performing maintenance and repairs of its boats; is that correct? A Yes. Q And if that maintenance or repair work could not be performed by Alta Mesa, Alta Mesa would be responsible for coordinating the repairs with an outside company? A Yes, sir.

Page 58: Q As part of your job, did you inspect and check the MISS NANCY? A Yes, sir. Not that morning, I didn't. But I would go out there in the afternoons, late afternoons, sometimes I work over and go check them, and take rides out, take things out, things to where they weren't doing their own job. And I wouldn't charge any overtime for it.

Page 59: Q Okay. So if Mr. Bertrand, Mr. Picou, and Mr. Ledano, all testified under oath, swearing to tell the truth, that the MISS NANCY was the only boat available to them, you're saying they're all not telling the truth? A I'm not saying that they're not.

Page 59: A I'm just saying the boat was there. It all depends which one they -- they had another boat at one time. We had a -- I think there was a rental.

Page 60: A But we did have another boat, but -- Q What was that boat called? A I don't remember. Q What kind of boat was that? A Almost the same. We had a work barge, we had a boat that Wayne -- Wayne used to use a boat.

Page 60: Q Who's Wayne? A Stirlings. He was -- he would take care of all the wells.

Page 60: Q Okay. As a lead operator, you're responsible for filling out monthly boat reports; is that right? A They went inspect the boats and if there was some fault, well, then, they would write it up.

Page 64: When the operators would report any potential problems or safety hazards with the boat, was it your responsibility to input that information on the Boat Report? A What they did was write job requests on them, informed Jamie. And when they would tell me about it, I would go in and tell Jamie. And there was also Troy that was there. And a few times they just say use the spare boat. But a lot of times the spare boat was a bigger boat. I don't remember the name of it. I know we had three boats at one time. And one of them, Mr. Wayne would use all the time. So -- but he would take better care of his boat that he used more often than what the operators would take care of the boat that they were using.

Page 64: Q But in terms of the Boat Report, this piece of paper (indicating) -- A (Witness examines document.)

Page 65: Uh-huh (yes). Q -- okay, see how it has a section that has comments? A Uh-huh (yes). Q The information on here is -- it's not handwritten, correct? This is something that's filled out on computer. A It used to be handwritten, yeah.

Page 65: Q But the one for this month of June the 17th -- A Uh-huh (yes). Q -- I mean, June of 2017 -- A Uh-huh (yes). Q -- can you look at this and confirm this is a computer-based report? A (Witness examines document.) Yes. Q Okay. And you see how there's a section that says comments? A Yes.

Page 65: Q What I'm asking is, is when the operators would report any potential problems or safety hazards with the boat -- A Uh-huh (yes). Q -- it would be your job, as the lead operator, to type that information into the comments

Page 66: section so that it was documented? A Uh-huh (yes).

Page 66: Q Correct? A They would do it themselves. They would report it to me and I'd pass it on. Then I'd -- sometimes I would go ride in the boat, check it out to see what the problem was. And then, it was reported to the mechanic. Q Okay. So who -- who filled out the boat reports? A The one that was on it, that was using it. They would check out everything that they -- before they get in the boat, they should have checked out the oil, the water, and the cleanliness of it.

Page 66: And there was a lot of times I'd go out there and they was never cleaned unless I'd take the trash out. But I would check just to -- I wouldn't check the fuel that often, but I would check the -- the water in the boat. Because sometimes they would -- they would -- the thing would leak, so I'd raise up the back of it and check things out to make sure that it wouldn't sink for the night.

Page 67: Q Okay. The issue of the MISS NANCY leaking, that's something that you knew about? A That I knew about? Q Yes, ma'am. A Everybody knew about it. Everything gets reported. It gets written. You don't know what happened to the paperwork. But then you'd turn it in. I don't know -- you know, I look at it. I'd go mention it to Jamie, you'd tell Troy. No, they're sitting down in their little hole and talking about other stuff.

Page 67: Q Let me see if I can cut to the chase. A No. You just don't want to hear anything more about Shell, or anything like that. But that company wasn't a good company.

Page 68: Q What company wasn't a good company? A None of them after Shell.

Page 68: Q Real quick. A I would pass things on. I have passed things on, I think it was Troy.

Page 70: Q Okay. You mentioned everyone knew that the boat was leaking, talking about the MISS NANCY. That's something that you said a couple of minutes ago.
Page 70: Q Well, I asked you that. I asked you -- you said that that's something that you saw yourself, because you inspected it. A I inspect, and then the others did, too.
Page 71: Q Okay. And so, what I understood you to say was the field operators reported that to you, and you reported it to Jamie and Troy. A They write out their paperwork. And the paperwork was given to Troy. And Troy was supposed to tell Jamie. Everything is supposed -- was supposed to have gone -- if something got cracked away, well, then -- because I would always report things or I would write it. Most of the time it was written out, because I don't -- I didn't like going into the bosses office.
Page 71: Q During the times that you inspected the MISS NANCY, do you remember there being plywood on the back deck? A I know they -- they used to have a piece of plywood back there, yeah.
Page 72: Q Okay. Do you believe that the wet plywood on the back deck of a work boat is a potential safety hazard?
Page 72: A If it is?
Page 72: Q Yes. A Definitely.
Page 74: Q Do you remember reporting up the chain of command to Jamie and Troy, that there was a problem with the MISS NANCY leaking? A No.
Page 84: Q I just want to go back to really the question that I asked, which is, after that problem was reported to you in a time period before Owens was injured, did you report it up the chain of command to Troy, or anyone else at all at Alta Mesa? A It was Troy. Q Okay. A I think they did, too, really.
Page 90: It's the Alta
Page 91: Mesa Holdings, LP Safety Manual.
Page 91: Number 3.
Page 91: Q And I'm referring to Bates
Page 32.
Page 91: Q Okay. Is it correct that the crew used the MISS NANCY on a daily basis for their work? A Uh-huh (yes). Yes, sir.
Page 91: Q Okay. Looking at the Alta Mesa Safety Manual, there's a section called Slips, Trips and Falls that's in front of you; is that right? A Yes, sir.
Page 91: Q It states that slips, trips and falls are major causes of accidents -- or excuse me, incidents resulting in injuries. Do you see that?
Page 92: A Yes, sir. Q Do you agree with that? A Yes, sir. Q The safety manual indicates that oily or slick floors or decks are common safety hazards that contribute to falls. Do you see that? A I see oily or slick floors and decks, yes, sir. Q Okay. So you would agree that water on the back deck of a boat can cause a safety hazard, correct? A Yes, sir.
Page 92: Q Wet plywood on the back of a deck can cause a slipping hazard, a safety hazard? A Yes, sir. It depends on which way you get on the boat, too.
Page 92: Q As a lead operator, if you've got a slippery wet plywood on the back of a deck, that's a slipping hazard, correct? A Yes, sir.
Page 94: Q And in this particular case, Alta Mesa was notified of the safety problems caused by the MISS NANCY leaking before Mr. Ledano's

Page 95: accident; is that right?
Page 95: A They would report it, yes, sir.
Page 95: Q Okay. A They have paperwork and all of that.
Page 102: Q Okay. Do you know if the plywood on the back deck of the MISS NANCY was removed after Owens' accident? A It was. I don't -- we weren't actually using the boat then, either, after, for a while.
Page 104: Q All right. Do you recall, ma'am, after the accident if the plywood was removed from the back of the MISS NANCY? A I'm sure that it was. Q Why is that? A Because that would be the right thing to do. Q Okay. How come? A It really shouldn't have been there. Q Why not? A Because of incidents like that. Q Slip hazards? A Yes, sir. I mean, we'd go into meetings like that.
Page 104: The real thing is to find out who put it there.
Page 107: Am I correct in my understanding that it's your testimony that if somebody operating the boat determined that there was a hazard on that boat, they were supposed to fill out a report for repair of that hazard?
Page 107: Q Is that how it was supposed to work? A If there was something wrong with the boat? Q Yes, ma'am. A Yes, sir.
Page 108: Q The report of the leaking of the boat, do they write that down? A Yes, sir. It's called a JSA, yes.
Page 108: Q All right. So with Alta Mesa, they were still supposed to write down the problem with the boat, the leaking, for example. What are they supposed to do with that piece of paper under the Alta Mesa rules?
Page 109: Q You can answer. A Oh. Inform the foremens of it, or the mechanics that would work on the boat. Q Okay. And to do that in writing? A Yes.
Page 109: Q Okay. And so, for example, Mr. Picou, if he went to the boat and he determined that it was leaking, it was incumbent upon him to fill out the forms to report that leak to people at Alta Mesa --
Page 109: Q -- is that right? A Okay. He found the leak? Q Yes, ma'am. A He needed to make a -- Q A written report? A Yes, sir.
Page 110: Q What was he supposed to do with that written report? A Inform the foremens about it. They would tell me sometimes, and then I would go tell them. Q And the foreman is Mr. Troy Mudd? A There was two of them; Troy and -- well, we wouldn't go to Jamie too much. It was Troy.
Page 111: Q Was there ever a time that either Mr. Picou, or Mr. Ledano, reported a leak in the boat to you that you did not report it to someone else? A No.
Page 112: Before the incident, did he ever tell you that he thought that the plywood on the MISS NANCY was a hazard, or a safety hazard? A No. Q Did Mr. Picou ever tell you that before the incident? A No.
Page 114: Q Okay. But my question is: Were the rules that if they knew there was a hazard in the vessel, a leak, or something like that, they weren't supposed to use the vessel until it got fixed? MR. BLANDA:
Page 114: A It should have been tagged.
Page 114: Q Right. And fixed? A And repaired, yeah. If they would have seen
Page 115: that tag, and that would have been a mechanic. Thing.
Page 117: Q Okay. And you testified earlier that when you -- there were times where you actually took the MISS NANCY out in the field. A Yes. Q And when you did that, if you saw some issue with the plywood, you would clean it up? A Yes, sir.

Page 119: Q So if the MISS NANCY was out of service for some reason, the operators who needed to go out in the field had access to those other boats? A Right.
Page 120: Q Exhibit Number 2 is in front of you. Is it your testimony that you did not fill out that report? Your name is not on it anywhere.
Page 121: A (Witness examines document.) Uh-uh (no).
Page 121: Q Uh-uh meaning no, you did not? A I didn't fill it out.
Page 121: Q Okay. A Who uses the boat fills it out, or who fueled the boat does.
Page 140: Q Okay. How often would you say you went out into the field in a boat? A Morning, noon and night. In a boat? Q Yes.
Page 149: Q Okay. And as we sit here today, your testimony is it was not your responsibility to fill out any information on any Boat Report? A If I went out there, I would. But as far as the boats, inspecting the boats, when they would come in, I would inspect the boats.
Page 154: Q Kind of looping back to my original question. Again, if Myron Picou and Owens Ledano -- A Uh-huh (yes). Q -- testified under oath that the procedure for filling out the Boat Reports is, they would come into the office, tell you any issues that they had with the boat, and that you would complete the report. Are you saying that was sometimes -- A It may -- Q -- that how it was done, or that's never how it was done, or what?
Page 154: A When I was working, it was always done. You may find it in there because if something happened, I'm pretty sure I logged it down for
Page 155: that day.
Page 157: Q All right. And if it was reported to you, your job, as the lead operator, would be to report it to your supervisor? A Correct. Now, what I would do, I would go out there and check, and then come back in and then tell them so that they can go back and check.
Page 157: Q When you say them, you mean Jamie and Troy? A Uh-huh (yes).
Page 160: So what I'm asking you is: As we sit here today --
Page 161: A Uh-huh (yes). Q -- do you know if there was any other work boats available on June 19th, 2017, other than the MISS NANCY? Do you know that for sure, or not? A No.
Page 161: Q Okay. A They weren't really good about repairing boats. Q Who? A The company, I guess.
Page 162: Q Okay. So when you said they were not -- A Alta Mesa was a very good company to work for, but it's the management that was in the field that was -- Q Got you. So when you said they were not good about repairing boats, you're referring to Jamie and Troy? A That's who you're seeing that was in there that time.
Page 162: Q So your answer is yes? You have to say yes or no. A Yes.

**MR. MYRON PICOU TESTIFIED AS FOLLOWS:**
Page 13: Q You were working under contract with Alta Mesa? A Yes, sir. Q Assigned to the Weeks Island West field?
Page 14: A At that time.

Page 14: A And then from there, we went and transitioned from Wood Group to Shamrock.
Page 27: Q Correct. Okay. Let's talk about the chain of command, okay, at Weeks Island Field on June 19th of 2017. Who was your direct supervisor out there? A Yvonne Muffoletto. Q What was her job title? A She was the lead operator. Q Who was she employed by? A Alta Mesa.
Page 28: Q Okay. Did you and Owens have the same job title, to your knowledge? A Yes, sir, operators. Q You weren't his supervisor? A No, sir. Q He wasn't your supervisor? A No, sir.
Page 29: Q Okay. And who was the next person in the chain of command above Ms. Yvonne, above the lead operator? A Troy Mudd. Q What was Mr. Mudd's job title? A I think his title was like field -- field foreman.
Page 29: Q Okay. Was Mr. Mudd employed by Alta Mesa, Shamrock, or some other company? A Alta Mesa.
Page 29: Q Okay. And who was next, the next person above Mr. Mudd? A Jamie Denavo.
Page 30: Q All right. What was Mr. Denavo's job title? A He was our production, he was over all of it.
Page 31: -- he was the production superintendent, I guess, for our area.
Page 36: Q Were you and Mr. Ledano assigned to a specific boat on June 19th of 2017? A Yes, sir. Q What was the name of that boat? A MISS NANCY.
Page 37: Q All right. Who owned the MS. NANCY on June 19th of 2017? A Alta Mesa.
Page 52: Q All right. And how often would you all be pumping chemicals as part of your normal job responsibilities?
Page 52: A Every day.
Page 54: Q Let me rephrase it better. Were you responsible for fueling up the boat? A Yes, sir.
Page 55: Q Okay. Were you all responsible for inspecting the boat for any potential maintenance issues? A Yes, sir.
Page 59: Q Did Alta Mesa require you to take any kind of boating safety course before you could operate their vessels? A Yes, sir, we did.
Page 61: I'm going to hand you a document. It says, Monthly Boat Report, Alta Mesa Services, LP.Month, 2017, June. Boat name, MISS NANCY.
Page 61: A Uh-huh (yes).
Page 61: Q Okay. Read the bottom sentence into the record, what I've got highlighted. A Check oil daily; practice good housekeeping; warm motor up before taking off; trim motor up after work; check fire extinguishers.
Page 62: Q Okay. All right. And who was responsible for actually, to your knowledge, completing or putting -- inputting the data into the boat report? A You'd turn it in and Ms. Yvonne would put it into the computer, unless she was on vacation, then it's whoever took her place would do it.
Page 63: Exhibit Number 2.
Page 63: Q Something's got your attention. A Uh-huh (yes).
Page 63: Q Feel free to talk. A It doesn't say in the comments that the boat
Page 63: was leaking water.
Page 63: Q Okay. Tell me about that. A Well, the boat had been leaking water and it was reported, but I don't see it in here. Not from the first or all the way down to the 31st. I see that the boat was out of the

water on the 21st, that's when it was taken out of the water for repairs. Q Okay. Did you regularly report that the MISS NANCY was taking on water?

Page 64: Q You can answer. A Yes, sir, we did. Q Okay. And who did you report that to? A Ms. Yvonne.

Page 64: Q All right. And again, you looked somewhat startled when you were looking at that paper. Your explanation for your -- A Well, it's -- Q -- your feelings about that are what? A Well, it says that the -- right here, I'm looking, bilge, okay (indicating). The bilge pump that particular day, I remember well, was not working correctly and that's what -- what Owens was checking out. We had water in the boat and he was trying to get it to work. And we had done checked the fuses on it. We normally turned the -- when we got water in the boat, we'd turn the bilge pump on while we're running. Because the boat is like this here (indicating) and it gets all the water to the back where the bilge pump is located.

Page 64: Q Okay. A Well, it wasn't going out, so he went to check

Page 65: it. And we told them that there was water in the boat, but it doesn't -- it's not mentioned in these comments. Q Again, for the record, you told who? A Ms. Yvonne. Q Okay. Alta Mesa? A Alta Mesa.

Page 65: Q Did you report to Ms. Yvonne at Alta Mesa on multiple occasions before Owens' accident that the MISS NANCY was leaking and taking on water? A Yes, sir. Q And would you have expected her, as the lead operator, to document that in the boat report?

Page 65: A I would have thought she did. I would have

Page 65: expected it.

Page 76: Exhibit Number 3.

Page 76: Q Okay. Let me ask you this: Is that how it looked on June 19th, 2017? A No, sir. Q Okay. What was different? A They had a piece of plywood in the back deck -- on the back deck, covered -- it covered it. In fact, the batteries that are sitting right there were also on that back deck, on that piece of plywood (indicating).

Page 77: Q Okay. How large was that piece of plywood? A The plywood went from both sides of the boat to the front of the -- the door here (indicating), where you walked into the cab from the back. All the way up to the -- if you look, there's a -- a little lid that your bilge pump is under right here (indicating), it went almost to that, but probably about this much shy of it (indicating). Q Okay. Was the plywood wide enough that it covered from one side of the back deck to the other? A Yes, sir. That's what we'd put our drums on.

Page 78: Q And to your knowledge, what was the purpose of the plywood being there? A To set the drums on.

Page 80: Q Got you. So to your knowledge, since 2012, when you started working for Alta Mesa, they had plywood covering the back deck of the MISS NANCY? A Yes, sir, they did.

Page 80: Q Did Alta Mesa ever change out the piece of plywood on the back deck of the MISS NANCY from the first time that you rode on it until the time of Owens' accident?

Page 81: A Not to my knowledge.

Page 81: Q What caused it, to your knowledge, to be blackish and discolored? A Chemical spills, greasy and oily. A little bit of oil, a little bit of grease, a little

Page 82: bit of chemical -- well, a lot of chemical.

Page 82: Q You mentioned the boat was commonly used to

Page 83: pump chemicals from the boat to the well. A Yes, sir.

Page 83: Q And would chemical spill onto the plywood? A Yes, sir, because you had to come out of that drum. Well, we have a -- a piece of pipe going into it with a 90, with a camlock connection that you hook to your pump. And then, the camlock to the pump with a hose to the platform. When you'd pull it out, the residue that was on that pipe would sometimes spill on the top of the drum and on the plywood and sink in. I mean, you could -- you wiped it up. Obviously, you wiped it up so it wouldn't get everywhere all over your footing, but you couldn't get it out of the plywood what was already there.

Page 83: Q Okay. Are you saying that the chemical would absorb into the plywood?

Page 84: Q And based on what you saw with your own eyes, is it fair to say that the plywood on the back deck of the MISS NANCY was soaked with chemical, oil, grease, the other things you described, long before Mr. Ledano's accident?

Page 84: A Correct.

Page 84: Q So what would happen when the plywood soaked in chemical, grease and oil would get wet? A It'd get slick. Q What do you mean by that? A Slippery.

Page 85: Q Okay. A The MISS NANCY had a leak. Q Yes, and you talked about that earlier when we were looking at the boat report. A Yes, sir. Q Remember, I told you I'd get to that later. Well, here we are. Right. So tell me about that.

Page 85: Yes, and you talked about that earlier when we were looking at the boat report. Yes, sir. Remember, I told you I'd get to that later. Well, here we are. Right. So tell me about that.

Page 85: A Well, it had a leak and we didn't know where it was coming from. We'd pump it out every day, you know, while we was on the -- in the boat. And if it wouldn't work, we'd check it out. And like I said, that particular day, that's what Owens was doing, he was trying to get it to -- to pump and he went down -- like if you look at it, if you look at this back deck (indicating) --

Page 86: A This is Exhibit Number 3. Q Okay. A This is the discharge hose and the bilge pump is underneath that little lip right there (indicating), there's a little lid.

Page 86: A A little corrugated like hose. Q Right. To the left of the white -- A To the left of the white containers. Q -- containers on the photograph. Okay. A There's a -- there's a bilge pump underneath that. So he had to get down there. He got down there and was trying to figure out what was wrong with this pump. And that's whenever he had gotten back up.

Page 87: A Every day we pumped it out -- Q It was -- A -- had water in the boat. Q It was bad enough you had to pump the water out of the boat after every shift? A Before every shift.

Page 88: Well, let me ask you this: Would it be so high that it would cover the plywood?

Page 88: A Yes, sir. It would cover the plywood a pretty good -- a pretty good ways up. Because, you know, your boat rides like this (indicating).

Page 89: Q Right. But when it's -- when you weren't in motion, the -- A Right. Q -- boat is standing -- A It's -- Q -- still. A Well, it's kind of a little bit on an angle. Q Yes. A It would come up to probably a little over half of the plywood.

Page 90: A If you'd slowed down. When you'd run, it would go back. But if you slowed down, when you'd pulled up to your location, if it wasn't finished pumping out, it would come forward. Q Into the cab? A Into the cab.

Page 90: Q Meaning, again, it was over the plywood? A Over the plywood and above the bilge hold. Bilge is what that's called, bilge hold. What did I say awhile ago?

Page 91: Q Before Mr. Ledano's accident, did you ever report those issues of the boat taking on water and making the plywood wet and slippery to Alta Mesa? A Yes, sir. Q Tell me about that. A Well, when we'd make our runs, we'd tell them the boat had -- the boat was full of water again this morning; the boat was full of water again this morning. You know, I mean, it's full of water, we need to get something done about it. Q And who you would report that to specifically? A Well, we'd let Ms. Yvonne know because she was

Page 92: our lead operator.

Page 92: Q Okay. A But I mean, we'd blab it out loud, you know, everybody could hear. Q When you say everybody, do you mean Troy Mudd and Jamie? A Troy and Jamie knew about it. Q Okay. What is -- what is the basis for your testimony that Troy and Jamie knew about the problem? A Well, we'd have safety meetings. Q Okay. A And it was brought up in a safety meeting the boat was leaking.

Page 92: Q Okay. That's something that was brought up in a safety meeting that you were present at? A Yes, sir. Q Before Mr. Ledano's accident? A Yes, sir. Q And attending those safety meetings would be direct employees of Alta Mesa, including Troy Mudd and Jamie -- I keep saying Desormeaux, but it's -- A Denavo. Q -- Denavo?

Page 93: A And -- and all of the red crew. All the contract. We -- we were all contract hands pretty much. And there were -- there was a few other guys that were Alta Mesa, but --

Page 97: Q Okay. And let me ask you this: Do you believe that Alta Mesa had knowledge that they had plywood covering the back deck of the MISS NANCY before Owens' accident?

Page 98: A Yes, sir, they knew.

Page 98: Q Okay. And tell me why you believe that. A Well, I'll tell you, because every one of them has rode in this boat. They rode in that boat going to the west side, going to a well site, they road in the MISS PAMELA, the MISS DELLA, the MISS GRACE, every boat that we had, they've been on them.

Page 98: Q Okay. But all the workboats that are configured like what's on Exhibit 1, did Alta Mesa have plywood on the back of all of those decks? A Yes, sir.

Page 102: Q Okay. Where was the boat located when the accident occurred? A A32. Q What is A32? A A32 is a well we was checking -- doing some work on, well, checking, getting numbers.

Page 102: Q All right. Where was A32 located? Was it out in the bay, or was in the bayou, or what? A A32 is located approximately 200 yards from

Page 102: Intracoastal Canal.

Page 105: Q Got it. When y'all got to A32, what was the condition of the back deck of the MISS NANCY? A It was still wet, full -- it still had water on it. Q Standing water? A Yes, sir, it did. Because, like I said before, the pump wasn't pumping like it normally did.

Page 105: Q Was the water over the plywood? A Yes, sir, it was.

Page 105: Q You mentioned, and Owen mentioned, you know, having to check on the bilge or work on the bilge on the boat when y'all were at A32. A That's correct. Q Okay. Tell me what was going on with that. A Owens, whenever we got -- when I docked up the boat, and I put the push knees up against the ladder -- there's a ladder to get up on the keyway, because that platform's particular

Page 106: keyway is a little higher that you just don't step off on it, you have to climb up. He went to the back and got down to see if there was anything hung up in that bilge, which you have to get down, you can't -- you're not cleaning it out without getting down.

Page 106: Q Okay. A And he got down. And when he got down there and he started -- and there was actually some -- some stuff in that -- in that little bilge hold. I get up on the platform. When Owens got up, he was coming, you know, to come in -- back into the cab, and he slipped and he fell. And when I -- when he fell, I heard him fall. I turned around, because it -- it hit pretty -- he hit pretty -- he hit kind of hard.

Page 117: Q Did Owens -- when y'all were on the boat, did he tell you what caused him to fall? A He slipped. He said he slipped. Q And again, where you saw his feet was on the wet plywood, correct? A Yes, sir. He told me, when he turned around, he slipped and he -- he hit, I want to say it was this side (indicating). When he -- when he -- when he turned around and went to get up to come meet me -- excuse me -- he -- he slipped and I think he said this side here (indicating).

Page 118: Q And what was it that he said he slipped on? A The plywood. And he was in the water, he was standing in water. Q And the reason why the plywood was wet that day? A Because the boat was leaking.

Page 122: Q What do you mean, it's not there anymore? A That plywood is not in that boat anymore. That plywood was taken out of the boat right after that happened.

Page 123: Q Let me ask you this: I mean, based on your experience as a contract worker working for Alta Mesa, okay, assigned to Alta Mesa's boat, during the years that you worked for them, do you believe that a Shamrock employee would have the authority to remove plywood from that Alta Mesa boat, or would that be an action that Alta Mesa would be responsible for?

Page 124: A I would think that would be upper management, your -- your supervisor, your field foreman or your, you know, somebody -- someone with authority. We don't have that authority. MR. BLANDA:

Page 125: Q Okay. You mentioned when you came back on hitch, the plywood was gone. A Yes, sir. The following seven days, when I went home for seven days and came back, it was gone. Actually, the boat was gone.

Page 125: Q Where did the boat go, to your knowledge? A In for repairs. But when the boat came back, there was no plywood in the boat and the boat was still leaking. Not as bad, but it still was leaking. Where did they take it, I don't know what shop. I wasn't a part of that. It was done while I was at home.

Page 126: Q Who is Ricky Lebeouf? A He was a mechanic for Shamrock. Well, worked

Page 126: through Shamrock. He was a mechanic for Alta Mesa working through Shamrock. He would be one that would fix a light for us, minor -- minor little things, little wiring things, you know, on the boat, things like that.

Page 126: Q Okay. Looking at Exhibit Number 2, I believe on the entry for June 21st, what does it say? A Ricky, boat out of water for repairs.

Page 130: Exhibit Number 5, it's AMC641.

Page 131: Q On 6/19/2017, at around 800, myself and Myron Picou were checking well, getting production number at Well Number A32. Myron was on the platform at the chart -- A Recorder. Q -- recorder. I turned on the bilge that was not pumping at the time. I went to the rear of the boat and removed the bilge cover, I believe. A That's what I'm thinking it is that's why I said, I couldn't understand it. Q I removed leaves and debris and the pump started pumping again. I was on my knees while working in the bilge. And I stood up, turned around and started to walk. While walking, I lost my footage and fell forward.

Page 131: I attempted to break my fall with my hand

Page 132: outward, but my shoulder made contact with the door frame. When I hit the door, I was off balance and it knocked me to the right where my back struck the door handle before falling forward in the cabin. Myron heard the noise and came to help me. We returned to the shore to see the medic. Boat tied to keyway at Well A32, and it has the date on it. Let me ask you this: If Owens testified under oath that the slippery plywood that was wet from the boat leaking is what caused him to lose his footing and fall, again, do you have any reason to doubt that?

Page 132: A No, sir, I do not.

Page 133: Exhibit Number 6.

Page 134: Q Can you just read it out loud, please? A We were tied up at keyway Well A32 getting numbers. I was on the keyway and Owens was in the MISS NANCY pumping out the bilge. I had heard a noise and turned around and Owens was on the floor of the boat. I went down to check on him. He was on his right side. I asked if he was okay. He said his right shoulder hurt. I helped him up and we came in and went to the medic.

Page 137: Q Okay. Tell me what you know about that. A I was told to go take pictures. I went took some pictures. Then I was told to go back with this phone and take pictures, which was the medic's phone.

Page 137: Q When you took pictures, was there water still on the back deck? A There was still water in the boat on the back deck, yes, correct. Q Was there water on the plywood? A Correct. Q Was the plywood wet? A Correct. Q Was the plywood soaked with chemicals?

Page 138: A Still was soaked with chemical. Q That's what you took pictures of? A That's exactly what I took pictures of. And I took pictures of the bilge pump at the time. Now, where that's at now, I don't have no idea.

Page 148: Q Right. And so, by the time you heard the crash and turned around, he was already on the deck? A He was on the floor.

Page 148: A That is speculation off of what he told me. But it's also, I actually slipped on that same

Page 149: plywood before that, but I didn't fall.

Page 149: Q Okay. When did you slip on that plywood? A I think it was about, if I had to try to remember, it's about a couple of hitches back. A couple of hitches. When I say a couple of hitches, I worked -- y'all going to think I'm strange, but when I say next week, I'm talking about next hitch. Q Right.

Page 149: Q You work seven and seven? A That's right. So a couple of hitches back, I was getting on the boat from the side. Q Yes. A And when I stepped down into it going across to put gas -- I was actually putting gas in the boat -- I slipped, but I -- I actually had the door, the door is open. You can see how the door is open in this picture right here (indicating).

Page 149: Q Yes, sir. A The way I had the dock -- the boat docked up sideways tied off on the front and the back --

Page 150: Q Yes. A -- when I stepped down into it, I slipped, but I caught the door, I didn't fall.

Page 150: Q Okay. When you slipped stepping on the boat, did you report that to anybody? A Yes, I did. Q Who? A I reported it to Eric -- well, Ms. Yvonne and Eric. I said the boat is still leaking -- is leaking, I slipped on it today. But I didn't tell them I fell, because I didn't fall.

Page 150: Q Okay. But did you tell them you slipped on slippery plywood? A I told them I slipped on the back deck of the boat. Q Okay. You didn't say anything about plywood? A No.

Page 155: Q Okay. And so, it was your decision to leave

Page 156: the dock with water on the back deck on top of the -- A No, sir.
Page 156: Q -- plywood that -- let me finish the question -- on top of the deck on the plywood that morning before you left that dock; was it not? A No, sir. Q Okay. Who made that decision? A Ms. Yvonne had us going get the numbers. We were told to go get our numbers, so we did. And when I left, like I said, there was about that much water on the back deck (indicating), so I turned on the bilge pump.
Page 156: When you're running, it goes to the back to that hole and it pumps better. Well, I say it pumps better, you get most of your water out. And when we went in the A Canal, it was -- like I said, it was just -- it wasn't pumping hard like it normally does.
Page 157: Q Okay. I want to make sure we're communicating and that we're clear. Ms. Yvonne told you to go get the numbers, just like you were supposed to get numbers every day you're on tour, right? A Yes, sir.
Page 157: Q Okay. And you could, you had the authority to keep that boat at the dock and pump that water out before you went and got the numbers, did you not? A I don't know if had authority. I don't have any authority, other than just going do my job.
Page 159: Q Okay. How did you report the condition of the vessel to Ms. Yvonne that day? A Verbally. Q Okay. Was that how you did it every day? A Yes, sir. Q Okay. Did -- that day, did you tell
Page 160: Ms. Yvonne that the boat was leaking? A I don't remember -- Q Okay. A -- that day. I mean, I would think I did, but I don't remember.
Page 167: Q Okay. You looked at the boat report earlier today in your deposition. A Just now.
Page 168: Q Is that the first time you've looked at that? A That's the first time I've seen that.
Page 196: Q All right. When you went back out -- after you brought Mr. Ledano in, but that day, you went back out? A I went back out for a little bit.
Page 204: Q Okay. Let me try and get you to give me your best recollection of when it was, prior to the incident, that this vessel leaking was discussed in a safety meeting. A Man. In a safety meeting prior to the
Page 205: incident? Q Yes. A I don't know.
Page 205: Q Okay. A I just know that they talked about it after that happened. But far as being reported about the boat leaking, that was ongoing.
Page 205: Q All right. But talked in a safety meeting, you can't say it was six months prior to the incident -- A I -- I don't know.
Page 206: Q To your knowledge, did Ms. Yvonne make any efforts to get the leak repaired? A You mean, like report it? Q No, to get it fixed. A She's not the one that would have got it fixed. Q Right. A At least to my knowledge, I don't think she would have been the one. She just reports it to Troy and Jamie.
Page 207: Q Do you know where the leak was? A No, sir. Q To this day? A No, sir. Q Okay. Has the leak been fixed? A Has the leak been fixed? The boat's still got a little leak. Q Okay. How long --
Page 260: Q Did you -- was that what you were trained to do, if there was a problem, report it to --
Page 261: A To your -- Q -- your direct supervisor? A -- your direct supervisor. Q And is that what you did? A That's what I did.
Page 261: Q And thereafter, you would rely on who to fix the problem if they chose to do so? A Upper management. Q Of what company? A Alta Mesa.
Page 263: Q When you took the boat back out that afternoon, after Owens' incident --

Page 264: A Uh-huh (yes). Q -- was it still taking on water? A Uh-huh (yes). Q You have to say -- you have to answer out loud. A Oh, I'm sorry. Yes, sir. Q Okay. Was it still taking on water, such that the plywood in the back was under water and wet? A Still wet.

**MR. RICKY LEBOEUF TESTIFIED AS FOLLOWS:**

Page 12: Q. You worked for Alta Mesa? A. Well, I worked for Shamrock, but the Alta Mesa people was my boss.

Page 14: Q. And what was your job title at that time? A. Mechanic.

Page 14: Q. And is it correct that you were assigned to the Weeks Island Field? A. Yes, sir. Q. And that's in Iberia Parish? A. Yes, sir.

Page 16: Q. Did -- of those seven mechanics, were they all employed by Shamrock or did Alta Mesa have some direct employee mechanics? A. Alta Mesa had some direct employee mechanics.

Page 16: Q. Okay.· And they did the same thing you did? A. Yes, sir. Q. Same job responsibilities? A. Yes, sir. Q. And was part of your responsibilities as a mechanic to provide maintenance and repair of work boats owned by Alta Mesa? A. Yes, sir.

Page 18: Q. And as a mechanic, did you provide routine maintenance and repair of the MISS NANCY? A. Yes, sir.

Page 18: Q. To your knowledge. A. To my knowledge, it would be told to Troy Mudd and Troy would hand it down to the mechanics.· A lot of the boats I take care of, I was the one taking care of them.

Page 19: Q. Got you. Who was Troy Mudd? A. He was a lead operator over there, over everybody, right underneath Jamie Denavo (sp), along with Joe Mire. It kind of branched down.· Jamie was the head guy.· Then you had Troy Mudd and Joe Mire.· Production foremens, Troy and Joe would have been. Q. So Troy Mudd was a production foreman? A. Yes, sir. Q. And what was Joe's last name? A. Mire. Q. He was also a production foreman? A. Yes, sir.

Page 19: Q. And were Troy and Joe directly employed by Alta Mesa? A. Yes, sir. Q. And you mentioned a guy named Jamie. A. Jamie Denavo. Q. What was Jamie's job title?

Page 20: A. He was the lead.· I guess he would have been the superintendent.

Page 20: Q. Who was your direct supervisor? A. I would say Mr. Wendell Weatherford.

Page 20: Q. Who was Mr. Weatherford? A. He would be the lead mechanic.· He also worked for Alta Mesa.

Page 20: Q. Okay.· Mr. Weatherford was your direct supervisor? A. Yes, sir.

Page 22: Q. Okay.· Got you. Do you remember someone named Yvonne Muffoletto? A. Yes, sir. Q. And who was that? A. She was also a lead at Weeks Island.

Page 23: Q. All right.· Who was -- do you remember a guy - - named Jamie Desormeaux? A. Yes, sir. Q. Who was that? A. He was the head person out there.· Jamie -- I mean, Troy and Joe Mire took their orders from him, and then it went down the chain of command.

Page 23: Q. Got you. And was Jamie Desormeaux an Alta Mesa employee or a contractor? A. Alta Mesa employee.

Page 23: Q. Do you remember a guy named Sterling Vaughn? A. Yes, sir. Q. And who was he?· Who did he work for? A. Alta Mesa. Q. What was his role? A. He was Jamie's boss.· When he retired, Jamie took his place.

Page 24: (EXHIBIT NO. 1 MARKED FOR IDENTIFICATION)

Page 24: Q. Can you identify the boat that's in this photograph? A. MISS NANCY.
Page 25: Q. All right.· And who owned the MISS NANCY on June 19 of 2017? A. Alta Mesa. Q. And is the MISS NANCY one of the boats that you performed maintenance on? A. Yes, sir.
Page 25: Q. Okay.· If something needed to be -- if maintenance needed to be done or repairs needed to be done on Alta Mesa's boats, including the MISS NANCY, who would give you those directions in terms of what your assignment would be? A. Troy Mudd.
Page 25: Q. Did you have any authority to perform any repairs on Alta Mesa's boats without
Page 26: instruction from Alta Mesa? A. No, sir.
Page 27: Q. Now, is that how the rear deck looked on June 19, 2017, or did Alta Mesa have something on the rear deck?
Page 27: A. There was a piece of plywood in this boat.
Page 27: Q. Okay.· And to your knowledge, why was there plywood on the back deck of the MISS NANCY?
Page 28: A. To keep the drums, chemical drums and the oil drums from sliding around on this bare aluminum.
Page 29: A· It would start at the cabin and it would end right about there (indicating).· These two white containers possibly had chemical in them, it would have been sitting on the plywood. Q. Okay.· And from side to side, would it go from port to starboard? A. Yes, sir. Q. Across the entire deck? A. Yes, sir.
Page 29: Q. If you were going to walk from the area of where the engine was to the cabin, was there any way to do that other than walking on the plywood?
Page 29: A. No, you'd have to walk on the plywood.
Page 30: Q. Okay.· If you were not going to stand up and walk on the gunnels, was there any way to walk from the area where the engine was on the boat to the cabin without stepping on the plywood?
Page 31: A. No, sir.· You'd had to step on the plywood.
Page 31: Q. When you first started working on this particular job for Alta Mesa, did the MISS NANCY have plywood covering the rear deck? A. Yes, sir. Q. And was that same plywood covering the back deck of the MISS NANCY from the time you started working there until Mr. Ledano's incident? A. Yes, sir.
Page 32: Q. Okay.· Based on your experience working in and around these boats, would the chemical and oil sometimes spill onto the plywood? A. Yes, sir.
Page 32: Q. And how would you describe the condition of the plywood in the MISS NANCY before Mr. Ledano's incident based on what you could see?
Page 33: A. Dirty, black.· You could tell it had oil stains, chemical stains.
Page 33: A. Just a piece of plywood that you walked over for 20 years, ten years, whatever with the chemical and oil on your shoes and falling off the hoses, coming out of the drums, coming out of the pump, you're going to have spillage. Q. Okay.· And did the plywood look like that, as you just described -- A. Yes, sir.
Page 34: Q. Okay.· And was that bilge strong enough to keep the back deck of that MISS NANCY dry --
Page 34: Q. -- or no? A. It would depend on the weight, how much water went in it, how many drums was back there. The more the drums, more water come through the cracks.
Page 34: Q. Okay.· When you said cracks, what are you referring to? A. Cracks in the bottom of the hull.

Page 34: Q. Okay.· And do you know where or why the MISS NANCY was taking on water before Mr. Ledano's
Page 35: incident?
Page 35: A. I know why because I was the one picked it up and filled it up full of water and there was
Page 35: cracks in the stern.
Page 35: Q. Okay.· Let me ask you this.· And I'm going to get to more detail about that in a minute. What happened when that plywood soaked in chemical and oil and grease and other stuff got wet?
Page 35: A. It gets slippery.
Page 37: Q. What did Mr. Mudd tell you? A. He wanted me to pick it up, put it on a trailer and see exactly if there was any holes in the bottom of it.
Page 38: Q. Okay.· And did he explain to you why he wanted you to do that? A. Yes, sir. Q. Why? A. Because there was a little accident.
Page 39: Q. Okay.· Where -- where did you see the cracks? A. The cracks was around the back of the stern where the engine sits.
Page 39: I'm going to hand you a copy of a document that was produced in this case. It's a Monthly Boat Report for June of 2017, for the MISS NANCY.
Page 40: Q. All right.· I want you to look at the entry for the date of June 21, 2017.· What does it say? A. Boat out of water for repairs.
Page 40: Q. Okay.· And who do you think Ricky is referring to? A. Myself.
Page 42: Q. And then from there, you took it to the shop? A. Yes, sir. Q. And then you filled it with water? A. Yes, sir. Q. And how did you do that? A. Put a garden hose in it, started filling it up.
Page 42: Q. Okay.· And how many cracks did you observe? A. There was at least three.· Two to three for sure.
Page 42: Q. Okay.· And did you inform Mr. Mudd that the stern of the MISS NANCY had multiple cracks in it? A. Yes, sir.
Page 43: Q. What did he tell you? A. Bring it to Zealous in Breaux Bridge and get it welded, get it fixed.
Page 43: Q. So Mr. Mudd told you that Zealous welded the cracks that were in the hull of the stern of the MISS NANCY? A. Yes, sir.
Page 44: Q. What else -- well, what -- did Mr. Mudd tell you to do anything else relative to the MISS NANCY after the accident? A. Yes, sir. Q. What did he tell you? A. Before I hauled it to Zealous, he told me to
Page 45: put non-skid tape on it.
Page 45: Q. What is the purpose of non-skid tape? A. To keep it from slipping on the aluminum.
Page 45: Q. I'm not asking you where the work was -- performed.· I'm asking where the non-skid tape was applied on the boat itself. A. On the bow. Q. Anywhere else? A. On the port and starboard side on what you call the gunwale, the gunnel.
Page 46: Q. At the time of Mr. Ledano's incident, was there non-skid tape on the rear deck of the
Page 47: MISS NANCY? A. What do you call the rear deck? Q. The stern. A. (Indicating). Q. Yes, sir. A. No non-skid there.
Page 47: Q. Was the plywood on the rear deck removed after Mr. Ledano's incident?
Page 47: A. Yes, sir.

Page 47: Q. Okay.· Tell me what you know about that. A. I was told it was taken out, and then I got off from my seven days.· When I came back, it was back in the boat. Q. And was it the same plywood that was there when Mr. Ledano fell? A. Yes, sir.

Page 48: Q. But when you did get back to work, you could see that the plywood was still there? A. Yes, sir. Q. But from what you were told, it was taken out, then reinstalled? A. Yes, sir. I think Mr. Brown had mentioned it to me.

Page 49: Q. Between the time you started working at the Weeks Island Field and the time of Mr. Ledano's incident, did Alta Mesa ever instruct you to take the MISS NANCY to any shop for repairs? A. No, sir.· Not that I'm aware of.· The only thing I couldn't do on the boat was the welding.· The engine and all of that, I could take care of.

Page 56: I'm almost certain this boat took care of what we called Weeks Island West.·

Page 58: Q. How long did y'all work Weeks Island together? A. I'd say about three years.

Page 62: On the 20th, I picked the MISS NANCY out of the water. Q. On June 20th? A. Yes, sir. Q. Of 2017? A. Yes, sir.

Page 66: but it would have been back underneath here (indicating), where the stern of the boat meets the bottom of the boat because of the stress with the motor running due to the weakness of the aluminum and the weight you're hauling.· These boats wasn't designed to haul four drums of chemical, that's probably 2,000 pounds.

Page 67: Q. Did you ever weigh the boats with any barrels of oil or other chemicals on them? A. No, sir.· But the barrels of chemical weigh -- the weight would be on the barrels of chemical, 400 pounds, 375. Q. So your testimony that barrels of -- that these boats were overstressed is your opinion, right? A. That's my opinion.

Page 69: Q. Did you take any pictures of the cracks? A. No, sir. Q. Did you take any measurements of the cracks? A. No, sir.

Page 81: Q. Okay.· How many pumps did you install onto the MISS NANCY before Mr. Ledano's incident? A. I'm pretty sure there was two pumps on every boat.· One of them was what we called automatic, had a float on it.· If it rained, nobody was in the boat, it'd kick on by itself.· The other one was on a manual switch, you had to turn it on and turn it off yourself.

Page 82: Q. And who would provide you with the authorization to perform any kind of repairs on the MISS NANCY? A. Troy Mudd.

Page 82: What was the proper chain of command in terms of who they were supposed to report problems to? A. They should have reported it to their lead. Q. Okay.· And their lead would be who? A. I think it was Ms. Yvonne.

Page 84: Q. Well, let's do that.· Just for the record, will you read out loud your handwritten notes for Tuesday, June 20, 2017? A. Okay.· I sent my time in.· I had 92 hours. Put non-skid tape on MOTOR VESSEL NANCY.

Page 85: Owens slipped down and hurt his self.· Put MOTOR VESSEL NANCY on trailer.· Hauled hull, leaks.· Brought to Zealous in Breaux Bridge. Storm in the Gulf, Cindy.