UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| PEDERO SANDERS,<br>*Plaintiff*<br><br>VERSUS<br><br>WEEKS MARINE, INC.,<br>*Defendant* | CIVIL ACTION NO. 2:23-CV-07317<br><br>SECTION: M; DIVISION: 1<br><br>JUDGE: ASHE<br><br>MAGISTRATE: DOSSIER |

**MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO EXCLUDE OR LIMIT OPINIONS AND TESTIMONY OF PLAINTIFF'S ECONOMIC LOSS EXPERT**

**MAY IT PLEASE THE COURT:**

Defendant, Weeks Marine, Inc. ("Weeks Marine"), respectfully submits this Memorandum in Support of its Motion *in Limine* to Exclude or Limit Opinions and Testimony of Plaintiff Pedero Sanders' Economic Loss Expert, Max Lummis.

**SUMMARY OF THE ARGUMENT**

In connection with the trial of this matter, Plaintiff Pedero Sanders ("Plaintiff"), has retained Max Lummis ("Lummis") to provide opinions and testimony related to Plaintiff's alleged past and future wage losses.[1] In pertinent part, with respect to Plaintiff's future wage loss, Lummis calculated Plaintiff's economic loss based upon Sanders' daily wage rate at the time of the accident ($36 per hour) and then subsequently grew his yearly wage rate based upon a speculative "inflation-adjusted 'real' wage growth rate" of 0.83% for the remainder of Plaintiff's work-life expectancy (2024-2050). From there, he then applied a 0.56% below-market-discount rate. Nevertheless, the net effect allows Plaintiff to "double-dip" on his future wage loss claim. Specifically, because Lummis utilizes both the below-market-discount method (which already

[1] Exhibit A, Lummis' Expert Report.

accounts for inflation) and also increases Plaintiff's yearly wage rate by 0.83% based upon a speculative and unsubstantiated 0.83% incremental increase, Lummis has essentially accounted for inflation twice.

*Culver II* mandates that when calculating using the below-market-discount method, "[o]ther evidence about the price of inflation is inadmissible." *See Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983) (*en banc*) (hereinafter "*Culver II*"). Because there exists absolutely no evidence that Plaintiff would have achieved any incremental base wage increase every year for the rest of his work-life expectancy, Lummis' calculations amount to nothing more than pure conjecture and speculation. Without real evidence of incremental increases in earnings, Lummis has essentially accounted for inflation twice all in defiance of *Culver II*. Considering the foregoing, Lummis' calculations increasing Plaintiff's base wage rate at an incremental rate to account for inflation are unreliable and improper. As detailed further herein, any such testimony is inadmissible and violates the well-established principles of *Culver II* and its progeny. Accordingly, this Court should prohibit Lummis from testifying at trial regarding his future wage loss calculations based upon a speculative inflation of Plaintiff's base wage rate/lost income stream.

Furthermore, Lummis should not be allowed to present any calculations of Plaintiff's future wage loss based upon an unsubstantiated extended work-life expectancy. Such testimony amounts to pure speculation and conjecture. *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir. 1984).

## FACTUAL AND PROCEDURAL BACKGROUND

### I. <u>The Alleged Incident</u>

This is an alleged Jones Act[2] personal injury case. Plaintiff, Pedero Sanders, an employee of Weeks Marine, alleges he sustained injuries to his neck, back, knees, shoulders, and other parts of his body as a result of a trip and fall while in the course of his employment.[3] On November 8, 2022, Weeks Marine assigned Plaintiff to work on a dredging project located in the Belle Chasse, Louisiana area. Plaintiff claims that while he was walking out of a supply shack (basically a shipping container) located on land, he tripped on a D-ring or chain, causing him to fall into the mud and allegedly sustain injuries. It is undisputed that Plaintiff tripped and fell on land.

Following the incident, Plaintiff filed suit against Weeks Marine and brought claims for: (1) Jones Act negligence; (2) unseaworthiness of the Dredge JS CHATRY; and (3) maintenance and cure.[4] A jury trial is currently scheduled to begin November 18, 2024.[5]

### II. <u>Lummis' Economic Loss Calculations</u>

Plaintiff retained Max Lummis ("Lummis") to provide a calculation of Plaintiff's economic losses allegedly caused by his November 8, 2022 accident.[6] In calculating Plaintiff's economic losses, Lummis relied upon: (1) Plaintiff's Original Petition Cause No. 23-7317; (2) Plaintiff's Scheduling Order; (3) The Markov Process Model of Labor Force Activity; and (4) 2024 Economic Report of the President,[7] as well as an interview with Plaintiff.[8] Lummis begins by calculating the earnings base. According to Lummis, assuming Plaintiff earned $36 per hour,

---

[2] Weeks Marine denies that Plaintiff qualifies as a Jones Act seaman and reserves all arguments with respect to same for the trial of this matter.
[3] R. Doc. 1.
[4] *See* R. Doc. 1.
[5] R. Doc. 18, at p. 4.
[6] *See* Exhibit A, Lummis' Expert Report.
[7] Exhibit A, Lummis' Expert Report, at p. 6.
[8] Exhibit A, Lummis' Expert Report , at p. 3.

worked 84 hours per week and that his typical hitch schedule was 28 days on and 14 days off, Plaintiff's projected gross annual earning capacity was $133,751, ***before*** taxes.

From this base wage rate, Lummis then calculated Plaintiff's past and future wage losses. As for past wage loss, Lummis calculated that Plaintiff has sustained $197,153 in past wage loss between the date of the accident and the date of trial. With respect to Plaintiff's future wage loss, Lummis increased Plaintiff's base wage rate by 0.83% per year for the rest of Plaintiff's work-life expectancy, citing to a generalized "average real wage growth rate observed from 1970 through 2023:"

> **III. Earning Capacity Growth**
>
> Starting in 2023, I have increased Mr. Sanders' pre-incident annual earning capacity each year using the average real wage growth rate observed from 1970 through 2023 of 0.83%. Please refer to Schedule 7 and Appendix III of the attached work papers for additional detail.

Lummis cites **no other evidence** for this 0.83% incremental increase other than this generalized "trend" of compensation growth.[9] In calculating Plaintiff's alleged lost future earnings, Lummis took Plaintiff's after-tax base wage rate and grew it every year by 0.83% through the rest of Plaintiff's work-life:

[9] Exhibit A, Lummis' Expert Report, at p. 29.

**Schedule 3** **Future Lost Earning Capacity**

| | |
|---|---|
| Age at Trial | 35.8 |
| Work Life Expectancy[1] | 61.0 |
| Real Risk Free Rate[2] | 0.56% |

| Date | Year | Age | After-Tax Pre-Incident Earning Cap.[3] | After-Tax Post-Incident Earning Cap.[4] | After-Tax Future Lost Earning Cap. | Discount Periods[5] | Present Value | Cumulative Present Value |
|---|---|---|---|---|---|---|---|---|
| 11/19/24 | 2024 | 35.8 | $ 97,914 | $ - | $ 97,914 | 0.50 | $ 97,643 | $ 97,643 |
| 11/19/25 | 2025 | 36.8 | 98,630 | - | 98,630 | 1.50 | 97,813 | 195,456 |
| 11/19/26 | 2026 | 37.8 | 99,353 | - | 99,353 | 2.50 | 97,984 | 293,440 |
| 11/19/27 | 2027 | 38.8 | 100,081 | - | 100,081 | 3.50 | 98,157 | 391,597 |
| 11/19/28 | 2028 | 39.8 | 100,816 | - | 100,816 | 4.50 | 98,330 | 489,927 |
| 11/19/29 | 2029 | 40.8 | 101,556 | - | 101,556 | 5.50 | 98,504 | 588,431 |
| 11/19/30 | 2030 | 41.8 | 102,303 | - | 102,303 | 6.50 | 98,679 | 687,111 |
| 11/19/31 | 2031 | 42.8 | 103,056 | - | 103,056 | 7.50 | 98,856 | 785,966 |
| 11/19/32 | 2032 | 43.8 | 103,815 | - | 103,815 | 8.50 | 99,033 | 884,999 |
| 11/19/33 | 2033 | 44.8 | 104,580 | - | 104,580 | 9.50 | 99,211 | 984,210 |
| 11/19/34 | 2034 | 45.8 | 105,352 | - | 105,352 | 10.50 | 99,390 | 1,083,600 |
| 11/19/35 | 2035 | 46.8 | 106,130 | - | 106,130 | 11.50 | 99,570 | 1,183,170 |
| 11/19/36 | 2036 | 47.8 | 106,914 | - | 106,914 | 12.50 | 99,751 | 1,282,922 |
| 11/19/37 | 2037 | 48.8 | 107,706 | - | 107,706 | 13.50 | 99,933 | 1,382,855 |
| 11/19/38 | 2038 | 49.8 | 108,503 | - | 108,503 | 14.50 | 100,117 | 1,482,972 |
| 11/19/39 | 2039 | 50.8 | 109,307 | - | 109,307 | 15.50 | 100,301 | 1,583,272 |
| 11/19/40 | 2040 | 51.8 | 110,118 | - | 110,118 | 16.50 | 100,486 | 1,683,758 |
| 11/19/41 | 2041 | 52.8 | 110,936 | - | 110,936 | 17.50 | 100,672 | 1,784,430 |
| 11/19/42 | 2042 | 53.8 | 111,760 | - | 111,760 | 18.50 | 100,859 | 1,885,288 |
| 11/19/43 | 2043 | 54.8 | 112,591 | - | 112,591 | 19.50 | 101,047 | 1,986,335 |
| 11/19/44 | 2044 | 55.8 | 113,430 | - | 113,430 | 20.50 | 101,236 | 2,087,571 |
| 11/19/45 | 2045 | 56.8 | 114,275 | - | 114,275 | 21.50 | 101,426 | 2,188,996 |
| 11/19/46 | 2046 | 57.8 | 115,127 | - | 115,127 | 22.50 | 101,616 | 2,290,613 |
| 11/19/47 | 2047 | 58.8 | 115,986 | - | 115,986 | 23.50 | 101,808 | 2,392,421 |
| 11/19/48 | 2048 | 59.8 | 116,852 | - | 116,852 | 24.50 | 102,001 | 2,494,422 |
| 11/19/49 | 2049 | 60.8 | 22,221 | - | 22,221 | 25.50 | 19,290 | 2,513,712 |

Thereby resulting in Plaintiff's base wage rate increasing from $97,914 (after taxes) in 2024 to $116,852 (after tax) in 2048. [10] Again, Lummis cited **no other evidence** for this annual 0.83% increase other than a generalized trend of compensation growth.

In addition, Lummis explained that he applied a 0.56% below-market discount rate to his calculations:[11]

> Net Lost earning capacity for each year was discounted to present value using long-run inflation adjusted, "real" risk-free rate of 0.56%.[5]

[10] *Id.*, at p. 11.
[11] *Id.*, at p. 4.

Utilizing both a 0.83% annual growth in compensation and a 0.56% below-market-discount rate, Lummis concludes that Plaintiff will more likely than not incur at least $2,513,712 in future economic loss, assuming Plaintiff cannot return to work in at least some capacity and assuming a loss period until January 15, 2050, Plaintiff's expected retirement date.[12] Lummis went on to include calculations of lost future earnings that assume Plaintiff continues to work between the ages of 62 and 70. Assuming Plaintiff could potentially work until the age of 70, Lummis calculates that Plaintiff will sustain future lost earnings of $3,442,865, again assuming Plaintiff does not return to work in any capacity.[13]

Notwithstanding the foregoing, Lummis' calculations utilizing both a 0.56% discount rate as well as an annual, speculative 0.83% incremental wage increase are improper, unreliable, and should be excluded from the trial of this matter. *Culver II* dictates that when utilizing the below-market-discount method, "[o]ther evidence about the effect of inflation is inadmissible." *Culver II*, 722 F.2d at 122. Lummis' calculations applying a generalized annual incremental wage rate of 0.83%, without any specific evidence of wage increases, violates the well-established principles of *Culver II* by essentially accounting for inflation twice and allowing Plaintiff to "double-dip." Such calculations are impermissible and inadmissible.

## LAW AND ARGUMENT

### I. ***Daubert* Standard**

Rule 702 of the Federal Rules of Evidence governs the admissibility of proffered expert testimony. Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

[12] Exhibit A, Lummis' Expert Report, at p. 2. Weeks Marine denies that Plaintiff cannot return to work in at least some capacity.
[13] Exhibit A, at p. 2.

> understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588 (1993); *United States v. Hitt*, 473 F.3d 146, 158 (5th Cir. 2006).

"The Supreme Court's landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, provides the analytical framework for determining whether expert testimony is admissible under Rule 702 of the Federal Rules of Evidence." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243 (5th Cir. 2002) (citing *Daubert*, 509 U.S. 579). Under *Daubert*, the Court acts as a gate-keeper and conducts a preliminary assessment to "determine whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).When the admissibility of expert testimony is challenged under *Daubert*, the proponent of the evidence bears the burden of proving that the testimony is both relevant and reliable. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998); *Mathis v. Exxon Corp.*, 302 F.3d 448, 460–61 (5th Cir. 2002) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). *See also Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012). Here, Davis bears the burden of establishing both relevancy and reliability.

With respect to relevancy, the proposed testimony must be relevant "not simply in the way all testimony must be relevant . . . , but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). The Fifth Circuit has explained:

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

*Vogler v. Blackmore*, 352 F.3d 150, 156 n.5 (5th Cir. 2003) (quoting FED. R. EVID. 702 advisory committee's note). Likewise, the reliability inquiry requires the court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *Daubert*, 509 U.S. at 589. District courts rely upon a myriad of non-exclusive factors when determining the reliability of an expert's testimony. These factors include: (1) whether the technique has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the technique's potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson v. Tex. Dept's of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004). The determination of whether an expert's testimony is reliable is a fact-specific inquiry. *Skidmore v. Precision Printing and Pkg., Inc.*, 188 F.3d 606, 618 (5th Cir. 1999).

## II. *Culver II* and the Below-Market-Discount Method

When properly plead and proven, under the General Maritime Law, a seaman may recover past lost earnings and loss of future earning capacity. In the seminal case of *Culver v. Slater Boat Co.* (hereinafter "*Culver II*"), the U.S. Fifth Circuit established the method for calculating lost wages in maritime cases. 722 F.2d 114 (5th Cir. 1983) (en banc). In *Culver II,* the Fifth Circuit fixed a four-step process for determining lost wages: (1) estimate the loss of work-life or expected remaining work-life of the plaintiff; (2) calculate the lost income stream; (3) compute the total lost income stream; and (4) discount the total to present value. *Id.*, at 117. *See also Nelson v. Cooper T. Smith Stevedoring Co.*, No. 12-2890, 2013 U.S. Dist. LEXIS 123876 (E.D. La. Aug. 28, 2013) (Vance, J.). This is known as the "below-market-discount method."

When calculating lost wages, the calculation of the lost income stream "begins with the gross earnings of the injured party at the time of the injury." *Id.*, at 117.[14] *See Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942, 950 (5th Cir. 2012) (reaffirming that lost wages should be calculated based upon the plaintiff's gross earnings at the time of injury); *Hernandez v. M/V RAJAAN*, 841 F.2d 582, 587-88 (5th Cir. 1988) ("*Culver II* requires the court to use the plaintiff's gross earnings at the time of the injury."). Nonetheless, because the court "cannot ignore the reality of inflation," in *Culver II*, the court established the method by which to determine the effect of inflation on a seaman's future earnings. *Id.* at 118-122. In evaluating the issue, the Fifth Circuit definitively held that, absent a stipulation to the contrary, the method to be used in adjusting damage awards to account for ***inflation*** would be the below-market-discount method. The court explained:

> In the below-market-discount method, the fact-finder ***does not attempt*** to predict the wage increases the particular plaintiff would have received as a result of ***price inflation***. Instead, the trier of fact estimates the wage increases the plaintiff would have received each year as a result of ***all factors other than inflation***. The resulting income stream is discounted by a below-market discount rate. This discount rate represents the estimated market interest rate, adjusted for the effect of any income tax, and the offset by the estimated rate of general future price inflation.

*Id.* at 118 (emphasis added).

Because "[n]o one can accurately predict the course of future inflation," the Fifth Circuit commanded fact-finders to adjust damage awards to account for inflation according to the below-

[14] Courts have also held it to be permissible to calculate lost earnings utilizing an average of the plaintiff's earnings from several prior years under the right circumstances. *See, e.g., Tran v. Abdon Callais Offshore, LLC*, No. 12-999, 2014 U.S. Dist. LEXIS 189873, at *2 (E.D. La. Sept. 22, 2014) (Zainey, J.) (holding that "an average derived from the earnings of each plaintiff over the three previous years [was] reasonable to use in determining each injured person's earnings at the time of injury" in accordance with *Culver II*); *In re Parker Drilling*, 323 F. App'x at 335 (approving the district court's calculation averaging the plaintiff's earnings over the previous five years); *Nelson v. Cooper T. Smith Stevedoring Co.*, No. 12-2890, 2013 U.S. Dist. LEXIS 123876, at *3 (E.D. La. Aug. 27, 2013) ("It is well-established in the Fifth Circuit that the trier of fact may rely on lost income stream calculation that is based on an average wage rate, particularly if the plaintiff has an inconsistent work history."); *Levine v. Zapata Protein (USA), Inc.*, 961 F. Supp. 942, 945-46 (E.D. La. Nov. 25, 1996) (Fallon, J.) ("Because of the uncertainty and unpredictability of the plaintiff's employment, it is fair and reasonable to utilize the average of these years in order to determine the appropriate annual wage at the time of the plaintiff's injury.").

market-discount method. *Id.* at 119. The court noted that the parties may stipulate the below-market-discount rate, but if they are unable to do so, they may introduce expert testimony concerning the appropriate rate. Nonetheless, *Culver II* makes clear that, ***"[o]ther evidence about the price of inflation is inadmissible."*** *Id.* at 122 (emphasis added). Evidence concerning the likelihood that the earnings of an injured worker would increase "due to personal merit, increased experience and other individual and societal factors" can still be considered, ***if appropriate under the facts and evidence of the case***. *Id.* at 122.

*Culver II* sought to prevent the average injury case from becoming a graduate seminar on economic forecasting by excluding from evidence earnings that are "so speculative that they cannot be accurately determined." *Id.* at 120. With respect to future earnings, "[t]he paramount concern of a court awarding damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned." *Culver II*, at 120. Thus, courts "commonly exclude many relevant factors from consideration on the basis that they are ***so speculative*** that they cannot accurately be determined." *Id.* (emphasis added). Likewise, "an award for damages cannot stand when the evidence to support it is ***speculative or purely conjectural***." *Masinter v. Tenneco Oil Co.*, 929 F.2d 191, 194 (5th Cir. 1991). Accordingly, evidence of increases in earnings cannot be speculative. *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942 (5th Cir. 2012) (reaffirming that calculation of lost wages begins with plaintiff's gross earnings at the time of the injury and awards for lost wages cannot be based upon speculation of conjecture).

**III. Lummis' future lost earning calculations, based upon Plaintiff's income growing at a base incremental rate per year, should be excluded as speculative and conjectural.**

As noted herein, *Culver II* holds that the method to be used in adjusting economic loss awards to account for inflation is the below-market-discount method. *Culver II*, 722 F.2d at 122.

*Culver II* makes clear that the fact-finder should "not attempt to predict the wage increases the particular plaintiff would have received as a result of price inflation." *Id.* at 118. Rather, the trier of fact may only estimate the wage increases the plaintiff would have received "as a result of all factors other than inflation." *Id*. Furthermore, taken together, *Culver II* and *Martinez* firmly establish that a seaman's earnings at the time of the injury must be utilized to calculate lost earnings. The calculation of lost earnings may not be based upon purely speculative and conjectural evidence. As such, *Culver II* and its progeny dictate that any speculation or theory of increases in a seaman's wages must fail in the absence of sufficient concrete evidence. Evidence that is completely lacking in this case.

As noted herein, Lummis' calculations begin with Plaintiff's base wage rate in 2022, the year of his alleged accident, which was $133,751, pre-tax. Thereafter, despite the clear mandates of *Culver II*, Lummis grows Plaintiff's base wage rate by 0.83% each year for his remaining work-life utilizing a ***generalized*** growth trend published by the Bureau of Labor Statistics.[15] These generalized growth trends also look to the consumer price index – a measure of inflation.[16] In other words, Lummis' incremental annual increase in Plaintiff's salary is not based upon any actual or real evidence of salary increases Plaintiff would receive or even expected to receive. Rather, it is based entirely on an "assumed trend" of growth. By growing Plaintiff's base wage rate at an "assumed" incremental rate and also applying a discount of 0.56%, Lummis has essentially "double-dipped" Plaintiff's future losses by essentially accounting for inflation ***twice***. In other words, by incrementally increasing Plaintiff's base wage rate and then multiplying by a 0.56% below-market-discount rate, Lummis has improperly grown Plaintiff's future wage loss.

---

[15] Exhibit A, Lummis' Expert Report, at p. 29. Lummis cites his source for the chart as being from the Department of Labor (Bureau Labor of Statistics).

[16] *See Bode v. United States*, 919 F.2d 1044, 1053 n.8 (5th Cir. 1990) (noting that the Consumer Price Index published by the Bureau of Labor Statistics is an inflation index).

Although evidence concerning the likelihood that the earnings of an injured worker would increase due to personal merit, increased experience and other individual and societal factors can be considered when increasing an injured worker's earnings base, Plaintiff (and Lummis) must set forth sufficient evidence to show – beyond mere speculation and conjecture – that he would have achieved a wage increase each year. *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942, 949 (5th Cir. 2012) ("[A]n award for damages cannot stand when the evidence to support it is speculative or purely conjectural.") (internal citations omitted).

Here, Plaintiff can present no evidence that his earnings would have actually increased each year by 0.83% between 2023 to 2050, as Lummis suggests. Because there exists no evidentiary basis to support an incremental wage increase 0.83% each year based upon Plaintiff's "personal merit, increased experience, or any other societal factors," Lummis' calculations are simply unreliable, improper, and speculative. Lummis' calculations clearly go against the established principles of *Culver II*, because Lummis speculates and assumes that Plaintiff would be promoted or that his wages would otherwise increase. Any such calculations are improper and inadmissible without a sufficient evidentiary basis. *See e.g.*, *Lewis v. SEACOR Marine, Inc.*, No. 02-116, 2002 U.S. Dist. LEXIS 29401, at *1 (E.D. La. Oct. 23, 2002) (Engelhardt, J.) (granting a motion *in limine* excluding any speculative testimony of "a possibility that the [seaman] might have been promoted to captain."); *Gilmore v. WWL-TV, Inc.*, No. 01-3606, 2002 U.S. Dist. LEXIS 24026 (E.D. La. Dec. 12, 2002) (excluding economic loss calculation based on higher earnings because plaintiff provided no reasonable basis for same, besides mere assumption or aspiration); *Scardina v. Maersk Line, LTD*, No. 00-1512, 2002 U.S. Dist. LEXIS 13468, at *8-9 (E.D. La. July 15, 2002) (Livaudais, J.) (granting a motion *in limine* and excluding economist from testifying to speculative and conjectural economic loss calculations at a jury trial); *Pallis v. United States*, 369

F. App'x 538 (5th Cir. 2010) (affirming district court's decision refusing to consider speculative evidence of higher earnings based upon an advancement theory); *Mayne v. Omega Protein, Inc.*, 370 F. App'x 510, 517 (5th Cir. 2010) (finding that economist's calculations based upon an assumption provided by the plaintiff's attorney with regard to annualized earnings were improper and amounted to speculation); *Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1137 (5th Cir. 1985) (holding that possibility alone cannot serve as the basis for recovery, for mere possibility does not satisfy the preponderance of the evidence standard).

The law is clear that the calculation of lost income begins with the gross earnings of the plaintiff at the time of the injury. *Culver II*, at 117; *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942, 950 (5th Cir. 2012). As such, Plaintiff's alleged future economic loss, if any, should be calculated using his earnings at the time of the injury – not speculative and conjectural higher earnings grown at an incremental basis from 2023 to 2050. Lummis' calculations run afoul of this well-established mandate and should be excluded from the trial of this matter. *See Taylor v. B&J Martin, Inc.*, No. 18-8941, 2020 U.S. Dist. LEXIS 41339, at *13 (E.D. La. Feb. 10, 2020) (finding that economic loss expert's calculations that accounted for inflation twice were improper under *Culver II*);[17] *Lawrence v. Great Lakes Dredge & Dock Co., LLC*, C.A. No. 17-9775, 2018 U.S. Dist. LEXIS 90722 (E.D. La. May 31, 2018) (Africk, J.) (excluding economist's testimony on the basis that he improperly calculated the plaintiff's gross earnings).

[17] Moreover, Weeks Marine contends that Lummis should not be afforded an opportunity to correct the insufficiencies contained within his report. *Adriatic Marine, LLC v. Harrington*, No. 19-2440, 2020 U.S. Dist. LEXIS 26514, at *17-18 (E.D. La. Feb. 13, 2020) (Vitter, J.). To do so would thwart the principles of *Culver II* and encourage noncompliance with Federal Rule of Civil Procedure 26 and Federal Rule of Evidence 702.

**IV. Furthermore, Lummis should not be allowed to offer any proposed calculations of future wage loss that exceed Plaintiff's statistical work-life expectancy.**

As noted in his report, Lummis states that Plaintiff has a statistical work-life expectancy of 61 based upon the Markov Process Model.[18] Assuming a work-life expectancy of 61, Lummis provides his future wage loss calculations. Nevertheless, Lummis also provides calculations assuming that Plaintiff may work until the age of 62 or up until the age of 70. Weeks Marine contends that if this Court permits Lummis to testify as to his future wage loss calculations (which Weeks Marine contends are improper), Lummis should also not be allowed to testify to any wage loss calculations that exceed Plaintiff's statistical work-life expectancy.

"The phrase 'work-life expectancy' literally reflects its meaning: the average number of years that a person of a certain age will both live and work." *Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475, 478 (5th Cir. 1984). Work-life expectancy "may be shown by evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live *and* work a longer, or shorter, period than the average. Absent such evidence, however, computations should be based on the statistical average." *Id*. (emphasis in the original).

Here, Lummis has cited ***no evidence*** that Plaintiff would continue to work past the age of 61 or his statistical work-life expectancy. As such, Lummis should not be allowed to testify to any future lost earnings calculations that assume, based on pure speculation, Plaintiff may work until he turns 70. *Naquin v. Elevating Boats, LLC*, No. 10-4320, 2012 U.S. Dist. LEXIS 66104, at *16 (E.D. La. May 11, 2012) (holding that expert could not testify to future wage loss calculations based merely on assumptions of Plaintiff's work-life expectancy); *Crompton v. Graphic Packaging Int'l*, No. 20-95, 2021 U.S. Dist. LEXIS 254735, at *8 (E.D. Tex. Nov. 22, 2021) (holding same).

[18] Exhibit A, Lummis' Expert Report, at pp. 4-6.

## CONCLUSION

Lummis has improperly calculated Plaintiff's future wage loss against the mandates of *Culver II*. Lummis has increased Plaintiff's base wage rate with a generalized annual increase that "assumes" a trend. Yet, there exists no factual or evidentiary basis to support any increase in wages – any such calculation amounts to mere speculation and conjecture unsupported by the record. Accordingly, for the aforementioned reasons, Lummis' calculations, report, and proposed testimony improperly calculating future wage loss should be excluded from the trial of this matter.

Respectfully submitted,

*/s/ Jefferson R. Tillery*

JEFFERSON R. TILLERY (La. Bar No. 17831)
SARA B. KUEBEL (La. Bar No. 38305)
ABIGAIL J. WEILAND (La. Bar No. 40543)
JONES WALKER, LLP
201 St. Charles Avenue – 48th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8616
Facsimile: (504) 589-8616
Email: jtillery@joneswalker.com
skuebel@joneswalker.com
aweiland@joneswalker.com

***Attorneys for Defendant, Weeks Marine, Inc.***