**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| PEDERO SANDERS,<br>*Plaintiff,* | §<br>§<br>§ | CIVIL ACTION NO. 2:23-cv-07317 |
| v. | §<br>§ | SECTION M (1) |
| WEEKS MARINE COMPANY, LLC,<br>*Defendant.* | §<br>§ | **JURY TRIAL DEMANDED** |

*************************************

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION IN LIMINE TO EXCLUDE OR LIMIT TESTIMONY BY PLAINTIFF'S ECONOMIC LOSS EXPERT**

Plaintiff respectfully submits this Memorandum in Opposition to Defendant's Motion in Limine to exclude or limit testimony regarding Plaintiff's economist, and respectfully requests that Defendant's Motion should be denied.

## I. BACKGROUND

Plaintiff was working for Defendant Weeks Marine as a Derrick Operator. While performing work as a Derrick Operator, Plaintiff went into an equipment shed that was improperly placed and set-up. In accessing this shed, Plaintiff fell and was injured by large chains that were supposed to be buried. Plaintiff filed this case as a result. Plaintiff brought claims for Jones Act negligence, general maritime negligence, and for unseaworthiness.

## II. ARGUMENT AND AUTHORITIES

### A. Legal Standard for *Daubert* Challenge

#### a. Challenge to Plaintiff's economist

Defendant moves to exclude or limit Plaintiff's economic expert on lost future earning capacity. Defendant does not challenge the relevance of the information, or even the expert's qualifications. Defendant's challenge of Plaintiff's expert goes to the reliability of the expert's opinions based on the methodology used by the expert. As such, Plaintiff's response will be

focused on that issue. The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786. In *Daubert*, the Supreme Court listed several non-exclusive factors for a court to consider in assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) the general acceptance of the methodology in the scientific community. *Id*. at 593-95, 113 S.Ct. 2786. However, a court's evaluation of the reliability of expert testimony is flexible because "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quotations omitted). In sum, the district court must ensure "that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152, 119 S.Ct. 1167. The party offering the testimony must establish its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc*., 151 F.3d 269, 276 (5th Cir. 1998).

In the instant case, Plaintiff's expert provides an estimate of Plaintiff's lost earning capacity using a calculation provided by the Fifth Circuit in the *Culver* II case. *Culver v. Slater Boat Co. ("Culver II")*,722 F.2d 114 (5th Cir. 1983) (en banc). Plaintiff faithfully follows the guidelines provided by *Culver* and its progeny. Defendant's allegation is that Plaintiff's expert manipulates the calculations to increase the value by 'double dipping' for inflation. Such is simply incorrect. A review of the methodology reveals that there is no 'double dipping' for inflation and that the expert's calculations are sound and follow standard methodology as provided by legions of cases.

**B. Plaintiff correctly follows the below-market-discount method**

**a. Plaintiff does not 'double dip' for inflation**

In *Culver* II, the Fifth Circuit held "fact-finders shall determine and apply an appropriate below-market discount rate as the sole method to adjust loss-of-future-earnings awards to present value to account for the effect of inflation." *Culver v. Slater Boat Co. ("Culver II"),*722 F.2d 114, 117 (5th Cir. 1983) (en banc). The *Culver* II Court went on to note that "even in a non-inflationary economy, earnings of a worker 'tend to inflate' from the operation of a number of factors, 'some linked to the specific individual and some linked to broader societal forces.' The operation of both kinds of influences should be considered to reach the first stage in calculating an appropriate award, an estimate of what the lost stream of income would have been 'as a series of after-tax payments, *one in each year of the worker's expected remaining career*.' *Id*. At 117.

Plaintiff's economist followed the methodology provided in *Culver* II. Plaintiff's economist grows Plaintiff's future wages by a fixed rate - .83%. This is exactly what the *Culver* II court calls for – consideration of wages that tend to inflate from both individual and broad societal forces. Plaintiff's economist does not pull .83% out of a hat or simply make it up. Such is the average of real wage growth over the last 50+ years. Such is the opposite of speculative. It is the historical rate of wage growth absent inflation. And, importantly, is not double dipping on inflation even when using a discount rate, so long as the discount rate has similarly been adjusted to remove the impact of inflation which Plaintiff's expert has done. Indeed, the 0.83% real wage growth represents long-term trends that have factored in various economic cycles over the last 50+ years - including periods of recession and growth. Using this historical average helps anchor wage projections in actual economic behavior over time, providing a balanced estimate. It is not inflation. And is the exact opposite of speculation.

**b. Plaintiff's income growth rate is not speculative or conjectural**

Plaintiff's calculations include a wage growth rate (.83%) that is *reduced* by the amount of inflation, and then the same inflation rate is subtracted from the discount rate. As such, the fact finder is looking at numbers that have excluded inflation – not double dipping for inflation. As such, the fact finder is comparing apples to apples. Importantly, the fact finder would get the exact same answer if the calculation was done by using the real wage numbers and then using a larger discount rate to obtain the present value – which seems to be what Defendant suggests should have been done. The irony is that the calculation would be equivalent. Mathematically, you can prove the equivalence using the Fisher equation: (1+nominal discount rate) = (1+real discount rate)×(1+inflation rate)(1+nominal discout rate) = (1+real discount rate)×(1+inflation rate). In this real (inflation adjusted) approach, since both the benefit stream and discount rate exclude inflation, the valuation directly reflects the intrinsic value based on the real rate of return. In the nominal approach (what Defendant suggests), inflation is included in both the cash flows and the discount rate, but because both are inflated equally, the end result is the same as in the real approach (Plaintiff's expert's calculation). This demonstrates that the nominal discount rate is essentially the real discount rate adjusted for inflation. When you use the nominal discount rate with nominal cash flows, the inflation effect is canceled out in the same way that using real cash flows and a real discount rate would cancel it out.

Defendant's argument is based on the incorrect assumption that the wage growth used by Plaintiff's expert is simply just inflation. Defendant supports this argument with conclusory statements, no analysis, and tortured logic. Once that argument fails, the rest of Defendant's argument falls apart. Defendant similarly argues that the growth rate of .83% is provided with no other evidence, yet glosses over the origin of the number (Bureau of Labor Statistics), the content

of the number (over 50 years of actual data on wage growth), and its widespread use in the financial industry. Simply put, Defendant argues over semantics, not methodology. Plaintiff's expert's methodology is sound and yields the same result as Defendant's suggested method.

**C. Plaintiff's work life expectancy**

Plaintiff's economist expert will not provide any testimony as to whether the Plaintiff will work until 62 or 70. As this Court is aware, experts in lost earnings or economists simply provide a calculation based upon certain criteria. The jury, based on how the evidence is presented, will determine issues such as the length of Plaintiff's work life expectancy. Plaintiff's economist's opinions are simply a calculation and a tool to help the jury if needed. Obviously, the jury could use or ignore this expert testimony. The expert's testimony is simply an aid to help the jury if they choose to use it. The jury might decide after sufficient evidence is presented that Mr. Sanders will work until 70, or 60, or even 50. The point is that the economist provides several scenarios for lost wages – no return to work, a minimum wage offset (partial return to work), and a work life expectancy between 60-70 years old. Each of these scenarios will provide the jury with a way to determine future lost wages once a determination is made by the jury as to his work life expectancy. Defendant asks this Court to strike this testimony prior to any evidence being presented to the jury related to the Plaintiff's work life expectancy – some of which will come from the Plaintiff himself. Accordingly, Defendant's motion is premature and should be denied.

**D. Defendant's argument lacks merit.**

Defendant's argument that the .083% real growth rate number is speculative borders on the ridiculous. Additionally, over decades, improvements in productivity, technology, and education have generally led to gradual increases in real wages. This is not inflation, and these are the other factors that increase wages other than inflation as referenced by the court in *Culver* II. Projecting

wages with a 0.83% real growth rate assumes that, in the long run, similar factors such as productivity, technology, and education will continue to contribute to upward pressure on wages. And, to be sure, a "real" growth rate is lower than a "nominal" growth rate because it has been adjusted to remove the impact of inflation. This is correctly calculating the first stage mentioned by the *Culver* II court - calculating an appropriate award, an estimate of what the lost stream of income would have been even over a long period of time. Point is, this is not simply growing wages by inflation. Quite the opposite.

Defendant's argument is that the rise in inflation is accounted for in the discount rate, and so it should not be counted twice. This assertion is simply false and mathematically incorrect. In order to discount future lost earning capacity to its present value, both the wage growth rate and discount rate must be absent of inflation which is the methodology utilized by Plaintiff's expert. But Defendant fails to realize that Plaintiff's expert's same conclusions can be reached using both a wage growth rate that includes inflation and a discount rate that includes inflation. It is six of one or a half dozen of another. It is a distinction with no difference. One would get the same answer either way. Wage growth which includes inflation is, by its very nature, a higher numerical figure than wage growth that has been adjusted to remove inflation. Using a wage growth figure that includes inflation would result in higher future wages for Plaintiff, but correspondingly, the discount rate would also be higher because it would also include the same inflation. Despite the higher, future wages and higher discount rate, Plaintiff's present value of future lost earning capacity would be exactly the same amount if performed correctly. If Plaintiff's expert had "double dipped" when factoring in inflation, he would have used a nominal (including inflation) wage growth rate which would be higher and a real (absent inflation) discount rate. This would result in higher future wages for Plaintiff because of inflation and an artificially low discount rate which

would overstate Plaintiff's lost earning capacity calculation. The alleged "double dipping" requires a mismatch between the growth rate and the discount rate which is not present in Plaintiff's expert's calculation.

**E. Plaintiff's work life expectancy**

Plaintiff's economist expert will not provide any testimony as to whether the Plaintiff will work until 62 or 70. As this Court is aware, experts in lost earnings or economists simply provide a calculation based upon certain criteria. The jury, based on how the evidence is presented, will determine issues such as the length of Plaintiff's work life expectancy. Plaintiff's economist's opinions are simply a calculation and a tool to help the jury if needed. Obviously, the jury could use or ignore this expert testimony. The expert's testimony is simply an aid to help the jury if they choose to use it. The jury might decide after sufficient evidence is presented that Mr. Sanders will work until 70, or 60, or even 50. The point is that the economist provides several scenarios for lost wages – no return to work, a minimum wage offset (partial return to work), and a work life expectancy between 60-70 years old. Each of these scenarios will provide the jury with a way to determine future lost wages once a determination is made by the jury as to his work life expectancy. Defendant asks this Court to strike this testimony prior to any evidence being presented to the jury related to the Plaintiff's work life expectancy – some of which will come from the Plaintiff himself. Accordingly, Defendant's motion is premature and should be denied.

**F. Alternatively, Plaintiff's expert economist can amend his calculation to meet the Court's directive on lost earning calculations**

In the alternative, Plaintiff's economist can calculate Plaintiff's lost earning capacity estimates with no wage growth, but with a larger discount rate (although the result would be the same). Similarly, Plaintiff can exclude any calculation to age 70. In the event this Court finds Defendant's

argument compelling, Plaintiff would ask this Court to allow Plaintiff's expert to amend his testimony and provide any calculations in line with any Order from this Court.

## III. CONCLUSION

Plaintiff's expert provides sound calculations for Plaintiff's lost earning capacity estimates. Defendant just does not understand the calculation, or ignores the accepted methodology that Plaintiff's expert uses. Defendant asks for exclusion of this testimony as a result. As previously explained, Defendant argues semantics and not substance. Defendant argues for a distinction with no difference. Plaintiff's expert uses sound methodology and flatly does not 'double dip' for inflation. As such, Defendant's motion should be denied. Indeed, the "rejection of expert testimony is the exception rather than the rule." See Fed. R. Evid. 702, Adv. Comm. Notes (2000).

*[signature block on next page]*

Respectfully submitted,

**THE BUZBEE LAW FIRM**

*/s/ Christopher J. Leavitt*

Christopher J. Leavitt
*Admitted Pro Hac Vice*
State Bar No. 24053318
Fed. ID No. 1045581
J.P. Morgan Chase Tower
600 Travis, Suite 7500
Houston, Texas 77002
Phone: (713) 223-5393
Facsimile: (713) 223-5909
Email: TBuzbee@txattorneys.com
Email: CLeavitt@txattorneys.com

**GARNER & MUNOZ**

*/s/ John G. Munoz*

Louisiana Bar No. 9830
935 Gravier Street, Suite 1140
New Orleans, Louisiana 70112-2411
Phone: 504-581-7070
Facsimile: 504-581-7083
Email: jgm@g-mlaw.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document will be served or has been served on all interested parties in accordance with the Federal Rules of Civil Procedure on the ***September 18, 2024***.

*/s/ Christopher J. Leavitt*
Christopher J. Leavitt