UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PEDRO SANDERS                                        CIVIL ACTION

VERSUS                                               NO. 23-7317

WEEKS MARINE, INC.                                   SECTION M (3)

### ORDER & REASONS

Before the Court are two motions for partial summary judgment and two motions *in limine* to exclude expert witnesses filed by defendant Weeks Marine, Inc. ("Weeks Marine").[1]  Plaintiff Pedro Sanders responds in opposition,[2] and Weeks Marine replies in further support of its motions.[3]  Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons.

### I.    BACKGROUND

This case concerns a trip-and-fall accident.  Sanders alleges that, on November 8, 2022, he was employed by Weeks Marine as a Jones Act seaman assigned to the dredge *JS Chatry*.[4]  He claims that, in the course of his work, he tripped and fell while retrieving supplies from a shack on land.[5]  According to Sanders, the supply shack is pulled into place at the worksite using "D-rings," and he tripped over one of the rings that was supposed to be buried, but was not, resulting in bodily injuries.[6]  Sanders filed this suit against Weeks Marine, alleging claims for Jones Act negligence,

---

[1] R. Docs. 25; 26; 27; 28.
[2] R. Docs. 31; 32; 33; 34.
[3] R. Docs. 35; 36; 37; 38.
[4] R. Doc. 1 at 1-2.  Weeks Marine denies that Sanders was a Jones Act seaman.  R. Doc. 26-1 at 1 n.1.  However, seaman status is not an issue before the Court in the pending motions.  The Court will assume, for the purposes of these motions only, that Sanders was a Jones Act seaman at the time of the accident.
[5] R. Doc. 1 at 2.
[6] *Id.*

unseaworthiness, and maintenance and cure.[7] In his complaint, Sanders states that he seeks "compensatory damages" for "past and future economic loss; past and future mental anguish; past and future pain and suffering; past and future bodily impairment and disfigurement; and past and future medical expenses," along with punitive damages, attorney's fees, and costs.[8]

Weeks Marine moves for partial summary judgment seeking dismissal of what it says are Sanders's claims for nonpecuniary damages that are not available to a Jones Act seaman, specifically, "past and future mental anguish" and "past and future bodily impairment and disfigurement."[9] Weeks Marine also moves for partial summary judgment dismissing Sanders's unseaworthiness claim, arguing that such a claim is not available because the accident occurred on land.[10] Next, Weeks Marine files a motion *in limine* to exclude the testimony and opinions of Sanders's safety expert, Robert Borison, arguing that Borison's report contains improper opinions that will not assist the jury in understanding the issues presented by this simple personal injury case.[11] Finally, Weeks Marine moves to exclude or limit the testimony and opinions of Sanders's economic loss expert, Max Lummis, arguing that Lummis's calculations doubly account for inflation, which is impermissible under *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir. 1983) (en banc) (hereinafter, "*Culver II*"), and provide future lost wage calculations beyond Sanders's statistical work-life expectancy.

---

[7] *Id.* at 2-5.
[8] *Id.* at 4-5.
[9] R. Doc. 25.
[10] R. Doc. 26.
[11] R. Doc. 27.

## II. LAW & ANALYSIS

### A. Weeks Marine's Motions for Summary Judgment

#### 1. Summary judgment standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*. A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id*. at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). The substantive law identifies which facts are material. *Id*. Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *EEOC v. Simbaki, Ltd*., 767 F.3d 475, 481 (5th Cir. 2014). Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th

Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994). In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence. *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008). Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001). Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial. *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A), (c)(2). Such facts must create more than "some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden. *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B). Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted. *See Little*, 37 F.3d at 1075-76.

**2. Weeks Marine's motion for partial summary judgment on certain nonpecuniary damages**

Weeks Marine seeks dismissal of Sanders's claims for nonpecuniary damages that are not available to a Jones Act seaman, including "past and future mental anguish" and "past and future bodily impairment and disfigurement."[12] In response, Sanders concedes that Jones Act seamen cannot recover certain categories of nonpecuniary damages and states that he does not seek such damages but intends to recover for mental anguish and bodily impairment as part of his claim for compensatory pain-and-suffering damages.[13]

"Nonpecuniary damages are those that are 'incapable of being defined by any recognized measure of value,' such as damages for loss of society or damages for grief or mental anguish." *Lewis v. Noble Drilling Servs., Inc.*, 2016 WL 3902597, at *3 (E.D. La. July 19, 2016) (quoting *McBride v. Estis Well Serv., L.L.C.*, 768 F.3d 382, 386 (5th Cir. 2014) (en banc)). In *McBride*, the Fifth Circuit confirmed that, under both the Jones Act and general maritime law, a seaman's damages for personal injury are limited to pecuniary losses. 768 F.3d at 389 (citing *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32-33 (1990)). Other sections of this court have since routinely followed *McBride* in similar cases to exclude nonpecuniary damages such as loss of enjoyment of life and mental anguish, *In re Adriatic Marine, LLC*, 2022 WL 1239950, at *2 (E.D. La. Apr. 27, 2022), and punitive damages and loss of consortium, *Lewis*, 2016 WL 3902597, at *4.

The Court therefore finds that Sanders is not entitled to damages for past and future mental anguish, past and future bodily impairment and disfigurement, or any other nonpecuniary damages

---

[12] R. Docs. 25; 35.
[13] R. Doc. 33. In his opposition, Sanders includes arguments about punitive damages related to his maintenance-and-cure claim. *Id.* at 4-6. The Court need not address these points because Weeks Marine's motion does not mention, or seek dismissal of, such claims. *See* R. Docs. 25; 35.

that are not related to his maintenance-and-cure claim. However, as Weeks Marine admits,[14] damages for pain and suffering are pecuniary and thus not precluded in this case. *See Vaughn v. Am. Com. Barge Line, LLC*, 672 F. Supp. 3d 184, 191-92 (E.D. La. 2023). Consequently, Weeks Marine's motion for partial summary judgment on nonpecuniary damages is granted, and Sanders's claims for past and future mental anguish, past and future bodily impairment and disfigurement, and any other nonpecuniary damages (excluding those related to his maintenance-and-cure claim) are dismissed with prejudice.

**3. Weeks Marine's motion for partial summary judgment on unseaworthiness**

Weeks Marine argues that Sanders cannot maintain a claim for unseaworthiness because the accident occurred on land and there is no evidence that the *JS Chatry* (or any other vessel) was unseaworthy or that any condition of the vessel was the proximate cause of the accident.[15] In opposition, Sanders argues that a "crew" moved and set the supply shack in place without first conducting a job safety analysis ("JSA"), resulting in poor planning and exposed D-rings, which, Sanders contends, is evidence of an improperly trained "crew" that created an unseaworthy condition.[16] Weeks Marine replies (1) that Sanders has not supplied any evidence there was an unseaworthy condition associated with the vessel and (2) that Sanders falsely implies that the vessel's crew moved and set up the supply shack, when it did not, with even Sanders testifying that such work was done by a shoreside crew.[17]

Separate and apart from the employer's duty to provide a safe work environment under the Jones Act is the vessel owner's nondelegable duty to provide its seamen with a seaworthy vessel

---

[14] R. Doc. 35 at 1 ("Weeks Marine only seeks the dismissal of non-pecuniary categories of damage that are not recoverable as a matter of law; it does not seek dismissal of Plaintiff's claims for past and future pain and suffering.").
[15] R. Doc. 26-1 at 2, 5-7.
[16] R. Doc. 34 at 5-7.
[17] R. Doc. 36 at 2 (citing R. Doc. 26-3 at 15).

6

under general maritime law. *See Usner v. Luckenbach Overseas Corp.*, 400 U.S. 494, 498-500 (1971). "To establish a claim of unseaworthiness, 'the injured seaman must prove that the [vessel] owner has failed to provide a vessel, including her equipment and crew, which is reasonably fit and safe for the purposes for which it is to be used.'" *Boudreaux v. United States*, 280 F.3d 461, 468 (5th Cir. 2002) (quoting *Jackson v. OMI Corp.*, 245 F.3d 525, 527 (5th Cir. 2001)). "A vessel's condition of unseaworthiness might arise from any number of circumstances," such as a "condition of the ship, her appurtenances, her cargo, or her crew." *Usner*, 400 U.S. at 499-500. Nevertheless, as to a vessel's seaworthiness, "[t]he standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." *Mitchell v. Trawler Racer, Inc.*, 362 U.S. 539, 550 (1960).

In terms of the causation necessary to establish a claim of unseaworthiness, a seaman must prove that "'(1) the unseaworthiness played a substantial part in bringing about or actually causing the injury and that (2) the injury was either a direct result or a reasonably probable consequence of the unseaworthiness.'" *Manderson v. Chet Morrison Contractors, Inc.*, 666 F.3d 373, 380 (5th Cir. 2012) (quoting *Smith v. Trans-World Drilling Co.*, 772 F.2d 157, 162 (5th Cir. 1985)). This standard has been likened to proximate cause and said to be more demanding than that required by the Jones Act. *See id.*; 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 6:25 (6th ed. 2018).

To the extent Weeks Marine argues that an unseaworthiness remedy is foreclosed simply because the accident occurred on land, it is wrong. "[T]he doctrine of unseaworthiness has been extended to permit a seaman … to recover from a ship owner for injuries sustained wholly on land, so long as those injuries were caused by defects in the ship or its gear." *Exec. Jet Aviation, Inc. v.*

7

*City of Cleveland*, 409 U.S. 249, 260 (1972) (citing *Gutierrez v. Waterman S.S. Corp.*, 373 U.S. 206, 214-15 (1963)). Nevertheless, Sanders's unseaworthiness claim still fails because he has not come forward with summary-judgment evidence that the *JS Chatry* (or any other vessel) was unseaworthy or caused his injuries. Indeed, the supply shack and exposed D-rings that caused the accident were not appurtenances of a vessel but at all relevant times were situated on land. *See, e.g., Farwah v. M/T Seatransport*, 2008 WL 11499226, at *3-4 (S.D. Tex. Mar. 28, 2008) (dismissing unseaworthiness claim of seaman who died in an automobile accident unrelated to the condition of the vessel or any of its equipment or appurtenances, upon observing that "[a]lthough the duty of seaworthiness includes the provisioning of adequate equipment for foreseeable shore duties, on shore transportation is not part of a vessel's 'equipment,'" and thereby distinguishing *Webb v. Dresser Indus.*, 536 F.2d 603, 606 (5th Cir. 1976) (upholding unseaworthiness claim where boots which the vessel made available to crew members performing duties ashore were alleged cause of injury)). Like the vehicle in *Farwah*, but unlike the boots in *Webb*, the onshore supply shack and associated D-rings were not part of any vessel's gear, equipment, or appurtenances. Nor is this this crux of Sanders's argument. Rather, Sanders contends that the vessel "crew" was so incompetent as to constitute an unseaworthy condition. In doing so, he implies, without saying, that the vessel crew was responsible for the shack and its placement, but he testified to the contrary that a shoreside crew set up the shack and has not submitted any summary-judgment evidence showing otherwise. Moreover, the lack of a JSA is not proof of crew incompetence either. *See Glaze v. Higman Barge Lines, Inc.*, 611 F. App'x 227, 229 (5th Cir. 2015) (observing that the "failure to conduct a job safety analysis, even if negligent, is not actionable as an unseaworthiness claim"). In sum, Sanders has not presented summary-judgment evidence demonstrating that this land-based accident was proximately caused by an unseaworthy

condition of a vessel. Weeks Marine's motion for partial summary judgment on Sanders's unseaworthiness claim is granted, and that claim is dismissed with prejudice.

### B. Weeks Marine's *Daubert* Motions *In Limine*

Weeks Marine filed two motions *in limine* to exclude the testimony and opinions of Sanders's experts – one directed at Sanders's safety expert, Robert Borison, and the other at Sanders's economic loss expert, Max Lummis.

#### 1. *Daubert* Standard

A district court has discretion to admit or exclude expert testimony under the Federal Rules of Evidence. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 139 (1997). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the Supreme Court held that Rule 702 requires a district court to act as a gatekeeper to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The reliability inquiry requires a court to assess whether the reasoning or methodology underlying the expert's testimony is valid. *See Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court listed several non-exclusive factors for a court to consider in assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subjected to peer review

and publication; (3) the known or potential rate of error; and (4) the general acceptance of the methodology in the scientific community. *Id.* at 593-95. However, a court's evaluation of the reliability of expert testimony is flexible because "[t]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) (quotations omitted). In sum, the district court must ensure "that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152. The party offering the testimony must establish its reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

Next, the district court must determine whether the expert's reasoning or methodology "fits" the facts of the case and whether it will assist the trier of fact to understand the evidence, *i.e.*, whether it is relevant. *Daubert*, 509 U.S. at 591. An expert's testimony is not relevant and may be excluded if it is directed to an issue that is "well within the common sense understanding of jurors and requires no expert testimony." *Vogler v. Blackmore*, 352 F.3d 150, 155 (5th Cir. 2003). Further, an expert cannot make "legal conclusions reserved for the court," credit or discredit witness testimony, or "otherwise make[] factual determinations reserved for the trier of fact." *Highland Cap. Mgmt., L.P. v. Bank of Am., N.A.*, 574 F. App'x 486, 491 (5th Cir. 2014).

Rule 702 also requires that an expert be properly qualified. Generally, if there is some reasonable indication of qualifications, the district court may admit the expert's testimony, and then the expert's qualifications become an issue for the trier of fact. *Rushing v. Kan. City S. Ry. Co.*, 185 F.3d 496, 507 (5th Cir. 1999), *superseded in part by statute on other grounds as noted in Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020). A witness qualified as

an expert is not strictly confined to his area of practice but may testify regarding related applications; a lack of specialization goes to the weight, not the admissibility of the opinion. *Cedar Lodge Plantation, L.L.C. v. CSHV Fairway View I, L.L.C.*, 753 F. App'x 191, 195-96 (5th Cir. 2018).

The facts, data, and sources used in an expert's opinion are generally considered by the jury in weighing the evidence, but "in some cases 'the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion.'" *Jacked Up, L.L.C. v. Sara Lee Corp.*, 807 F. App'x 344, 348 (5th Cir. 2020) (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987)). As the gatekeeper, a district judge must "extract evidence tainted by farce or fiction. Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all." *Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996). "Generally, the fact-finder is entitled to hear an expert's testimony and decide whether the predicate facts on which the expert relied are accurate. At the same time, however, expert testimony that relies on completely unsubstantiated factual assertions is inadmissible." *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 515 (5th Cir. 2013) (internal quotation marks, alterations, and citations omitted). Ultimately, the expert must "'bring to the jury more than the lawyers can offer in argument.'" *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992) (quoting *In re Air Crash Disaster at New Orleans,* 795 F.2d 1230, 1233 (5th Cir. 1986)).

**2. Weeks Marine's motion to exclude Sanders's safety expert Robert Borison**

To support his claims, Sanders hired Borison to testify as a marine safety expert. Borison has over 50 years of experience in marine and commercial safety.[18] Borison reviewed the evidence in this case and performed "root cause" analysis in which he opines that Weeks Marine failed to

---

[18] R. Doc. 27-2 at 2. Weeks Marine does not challenge Borison's qualifications.

11

provide Sanders with a safe vessel to work on because did not remove the shackle and D-ring from the supply shack's skid after setting it up for service.[19]

Weeks Marine argues that Borison's testimony and opinions should be excluded because expert testimony is not necessary to understand the issues presented in this simple trip-and-fall case.[20] Weeks Marine contends that a trip-and-fall hazard is within the ordinary understanding of a lay juror and the issues can be resolved by employing common sense.[21] Weeks Marine also points out that Borison opined that it failed to provide Sanders with a safe vessel, which amounts to a legal conclusion for the factfinder to make.[22]

In opposition, Sanders argues that Borison should be permitted to testify because the "average man" does not understand that supply shacks are needed at worksites or how supply shacks are moved and placed.[23] He says that this is specialized knowledge within the maritime industry.[24] Sanders also argues that Borison will testify that a JSA could have prevented the accident and that Weeks Marine failed to follow safety regulations.[25]

Weeks Marine reiterates in its reply that Borison's opinion – that the D-ring should have been removed or buried to prevent a tripping hazard – is "neither highly technical nor hard to understand" and, thus, entirely within the common understanding of the jury.[26] Citing cases excluding Borison's testimony with respect to similar common-sense matters, Weeks Marine contends that Sanders underestimates the intelligence of the average juror, who can understand, without expert testimony, the circumstances surrounding a trip-and-fall accident and that a pre-

---

[19] *Id.* at 6.
[20] R. Doc. 27-1 at 7-9.
[21] *Id.*
[22] *Id.* at 9-10.
[23] R. Doc. 31 at 7.
[24] *Id.*
[25] *Id.* at 8.
[26] R. Doc. 37 at 1-2.

task meeting (including a JSA) can be helpful to prevent accidents.[27] Weeks Marine also urges that Borison should not be permitted to testify about JSAs or why supply shacks are needed and how they are moved and placed because his report does not state any opinions on those topics.[28]

Borison, who has more than 50 years of experience in marine safety, is qualified to offer opinions on the topic. However, his report does not state any opinions for which such expertise is required. Borison's sole opinion is that the exposed D-ring created a tripping hazard. This opinion does not relate to any specialized maritime activity or equipment for which expert testimony would be required. The average juror is certainly familiar with tripping hazards and can resolve the issues presented in this case without expert testimony. Further, Borison's opinion on tripping hazards does not implicate industry standards that are not also within the understanding of jurors. Moreover, Borison cannot testify about JSAs or the use and movement of supply shacks because he does not discuss them in his report. *See Richardson v. SEACOR Lifeboats, LLC*, 2015 WL 2193907, at *2 (E.D. La. May 11, 2015) (limiting expert testimony to opinions expressed in report or discussed in deposition). For these reasons, Weeks Marine's motion *in limine* to exclude Borison's opinions and testimony from trial is granted.

### 3. Weeks Marine's motion to exclude or limit Sanders's economic loss expert Max Lummis

Sanders hired Lummis to calculate his lost wages. Lummis is a certified public accountant, certified fraud examiner, and certified valuation analyst, who has worked as a forensic accountant since 2004.[29] Lummis issued a report in the case with four calculations: (1) Sanders's past lost wages from the date after the accident (November 9, 2022) to the expected trial date (November 18, 2024) in the amount of $197,153; (2) Sanders's future lost wages through his average work-

---

[27] *Id.* at 2-3.
[28] *Id.* at 1, 3.
[29] R. Doc. 28-2 at 30. Weeks Marine does not challenge Lummis's qualifications.

life expectancy of 61 years, discounted to present value, in the amount of $2,513,712; (3) Sanders's future lost wages if he works until age 62, discounted to present value, in the amount of $2,616,386; and (4) Sanders's future lost wages if he works until age 70, discounted to present value, in the amount of $3,442,865.[30] To calculate the lost future earnings, Lummis "increased projected pre-tax annual earning capacity each year from 2023 through Plaintiff's average work life expectancy using an inflation-adjusted 'real' wage growth of 0.83%," then he "discounted back to the expected trial date using an inflation-adjusted risk-free rate of 0.56%."[31]

Weeks Marine seeks to exclude or limit Lummis's testimony and opinions regarding Sanders's future lost wages, arguing that he doubly accounts for inflation, which is impermissible under *Culver II*.[32] Weeks Marine contends that Lummis, without evidence of Sanders's potential wage growth, speculatively increased Sanders's annual wages by 0.83%, and then applied a 0.56% discount rate, which allows Sanders to "double-dip" on his future wage loss claim.[33] Weeks Marine further argues that Lummis should not be permitted to testify as to Sanders's future lost wages beyond his statistical work-life expectancy of 61 years because there is no evidence that he would work longer.[34]

In opposition, Sanders argues that Lummis "faithfully follows" *Culver II* and does not "double-dip" in accounting for inflation.[35] According to Sanders, Lummis properly increased his wages over time by 0.83% to account for "both individual and broad societal forces," which he says is not speculative because the figure comes from the Bureau of Labor Statistics ("BLS"), and then applied a 0.56% discount rate to account for inflation.[36] Sanders claims that the result would

---

[30] *Id.* at 2.
[31] *Id.*
[32] R. Doc. 28-1 at 1-2.
[33] *Id.* at 1-2, 10-14.
[34] *Id.* at 2, 14.
[35] R. Doc. 32 at 2.
[36] *Id.* at 3-6.

have been the same if Lummis had used real wages and applied a larger discount rate to calculate present value.[37] As to his work-life expectancy, Sanders argues that Lummis will not offer any opinions regarding how long he would have worked, but rather will only provide various wage calculations from which the jury can choose once it determines his work-life expectancy from other evidence.[38] Finally, in the alternative, Sanders argues that Lummis should be permitted to provide revised calculations with no wage growth, utilizing a larger discount rate, and excluding any calculations that go to age 70.[39]

Weeks Marine reiterates in its reply that the 0.83% wage growth rate used by Lummis is speculative, and thus improper, because there is no evidence that Sanders would have actually received wage increases.[40] It also argues that Lummis should not be permitted to present evidence of future lost wages beyond Sanders's statistical work-life expectancy because there is no evidence that Sanders would have worked that long.[41] Finally, Weeks contends that Lummis should not be permitted to amend his report to provide new calculations because the time has passed for providing expert reports and he could have performed the calculations correctly in the first place.[42]

In *Culver II*, the Fifth Circuit set out a four-step process for calculating future lost wages in maritime case: "estimating the loss of work life resulting from the injury or death, calculating the lost income stream, computing the total damage, and discounting that amount to its present value." 722 F.2d at 117. The calculation "begins with the gross earnings of the injured party at the time of the injury," including fringe benefits, and subtracts amounts for taxes and work expenses. *Id.* After discussing alternative methods and the possibility of party stipulations, the

---

[37] *Id.* at 4-7.
[38] *Id*. at 5, 7.
[39] *Id.* at 7-8.
[40] R. Doc. 38 at 1-4.
[41] *Id.* at 4-5.
[42] *Id*. at 5-6.

*Culver II* court stated that inflation is best accounted for by applying the below-market-discount method, which it explained as follows:

> In the below-market-discount method, the fact-finder does not attempt to predict the wage increases the particular plaintiff would have received as a result of price inflation. Instead, the trier of fact estimates the wage increases the plaintiff would have received each year as a result of all factors other than inflation. The resulting income stream is discounted by a below-market discount rate. This discount rate represents the estimated market interest rate, adjusted for the effect of any income tax, and then offset by the estimated rate of general future price inflation.

*Id.* at 118-22 (quotation at 118). Further, the court stated that "[e]vidence about the likelihood that the earnings of an injured worker would increase due to personal merit, increased experience and other individual and societal factors continue, of course, to be admissible." *Id*. at 122. Because an award of "damages for lost future earnings is to provide the victim with a sum of money that will, in fact, replace the money that he would have earned," such an award "cannot stand when the evidence to support it is speculative or purely conjectural." *Martinez v. Offshore Specialty Fabricators, Inc.*, 481 F. App'x 942, 949 (5th Cir. 2012) (quotations omitted).

Applying these principles to this case, Lummis's testimony and opinions on Sanders's future lost wages are inadmissible because he doubly accounts for inflation. As noted above, Lummis increased Sanders's annual income by a factor of 0.83%, and then discounted the income stream to present value using a 0.56% discount rate. The supposed annual increase was based entirely on the statistical wage growth rate developed by the BLS (which rate Sanders admits is "inflation-adjusted"), not evidence of Sanders's actual expected increased earnings due to personal merit or increased experience. This directly contradicts *Culver II* which explicitly instructs that the trier of fact shall "not attempt to predict the wage increases the particular plaintiff would have received as a result of price inflation," but instead should be limited to "estimate[ing] the wage increases the plaintiff would have received each year as a result of all factors *other than inflation*."

16

772 F.2d at 118 (emphasis added).  Thus, Lummis's calculations are wrong as a matter of law and must be excluded from trial.  *See Taylor v. B&J Martin, Inc.*, 611 F. Supp. 3d 278, 284-87 (E.D. La. 2020) (excluding the opinions of an economic expert when he double-counted inflation by first increasing the plaintiff-seaman's annual wages by a BLS factor that "incorporated the influence of inflation upon wages" and then applying a discount rate).

In the interest of justice, however, the Court will allow Lummis 14 days to amend his report utilizing the proper methodology explained above.  Weeks Marine shall have 14 days from the date it receives Lummis's revised report to obtain its own amended expert report.  Additionally, Weeks Marine may re-depose Lummis at a date convenient to the parties.

With respect to the work-life expectancy issue, Lummis may testify at trial as to Sanders's future lost wages up to ages 62 and 70, if Sanders first presents other evidence that he would have continued to work past his statistical work-life expectancy of 61 years.  In *Deperrodil v. Bozovic Marine, Inc.*, the Fifth Circuit explained that courts generally use statistical work-life expectancy data to calculate future earnings, unless there is evidence "that a particular person, by virtue of his health or occupation or other factors, is likely to live and work a longer, or shorter, period than the average."  842 F.3d 352, 361 (5th Cir. 2016); *see also Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 329 (5th Cir. 2020) (applying *Deperrodil*).  Thus, at this juncture, Weeks Marine's motion *in limine* to exclude Lummis's testimony concerning Sanders's future lost earnings up to ages 62 and 70 is denied (although his report must be revised in accordance with *Culver II*).  However, Lummis will not be able to offer this testimony at trial if Sanders does not first adduce evidence that he would have worked past age 61.

## III. CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that Weeks Marine's motion for partial summary judgment on certain nonpecuniary damages (R. Doc. 25) is GRANTED, and Sanders's claims for past and future mental anguish, past and future bodily impairment and disfigurement, and any other nonpecuniary damages (excluding those related to his maintenance-and-cure claim) are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Weeks Marine's motion for partial summary judgment on unseaworthiness (R. Doc. 26) is GRANTED, and that claim is DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Weeks Marine's motion *in limine* to exclude Borison's testimony and opinions (R. Doc. 27) is GRANTED.

IT IS FURTHER ORDERED that Weeks Marine's motion *in limine* to exclude or limit Lummis's testimony and opinions (R. Doc. 28) is GRANTED in part (as to exclude his current calculations of future lost wages) and DENIED in part (as to permit a revised calculation of future lost wages in accordance with *Culver II* even up to ages 62 and 70 if the proper evidentiary foundation is laid).

IT IS FURTHER ORDERED that, within 14 days of today, Lummis must amend his report utilizing the proper methodology explained above. Weeks Marine shall have 14 days from the date it receives Lummis's revised report to obtain its own amended expert report, and Weeks Marine may re-depose Lummis at a date convenient to the parties.

New Orleans, Louisiana, this 27th day of September, 2024.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE